[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-10128
_____

D.C. Docket No. 3:14-cr-00046-CAR-CHW-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ERICKSON MEKO CAMPBELL,

Defendant-Appellant.
_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(August 14, 2020)

Before MARTIN and TJOFLAT, Circuit Judges, and MURPHY,[*] District Judge.

TJOFLAT, Circuit Judge:

_____

[*] Honorable Stephen J. Murphy III, District Judge for the United States District Court for the Eastern District of Michigan, sitting by designation.

On its own motion, the Court vacates its prior opinion, *United States v. Campbell*, 912 F.3d 1340 (11th Cir. 2019), filed January 8, 2019, and substitutes the following opinion in its place.

This appeal presents important questions about the proper confines of a traffic stop. First, whether a highway patrolman had reasonable suspicion to stop a motorist for a rapidly blinking turn signal. Second, if there was reasonable suspicion, whether the seizure became unreasonable when the patrolman prolonged the stop by questioning the motorist about matters unrelated to the stop's mission. The District Court concluded that the initial stop was valid and that the questioning about unrelated matters did not transform the stop into an unreasonable seizure. The District Court therefore denied the motorist's motion to suppress inculpatory evidence discovered during a subsequent search.

We agree that there was reasonable suspicion to stop the motorist. But we find that under the Supreme Court's recent decision in *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), the patrolman did unlawfully prolong the stop. Because his actions were permitted under binding case law at the time, however, the good faith exception to the exclusionary rule applies. We thus affirm the denial of the motion to suppress.

I.

2

A.

At about 9:00pm on a brisk night in December 2013, Deputy Sheriff Robert McCannon was patrolling Interstate 20 in Georgia when he observed a Nissan Maxima cross the fog line.[1]  McCannon activated the camera on the dashboard of his patrol car, and after observing the Maxima cross the fog line a second time and noticing that its left turn signal blinked at an unusually rapid pace, he pulled the car over.  He approached the Maxima, introduced himself to the driver, Erickson Campbell, asked him for his driver's license, and explained why he had pulled him over.  After determining that the Maxima's left turn signal was malfunctioning, McCannon decided to issue Campbell a warning for failing to comply with two Georgia traffic regulations: failure to maintain signal lights in good working condition,[2] and failure to stay within the driving lane.[3]  McCannon asked Campbell

---

[1] The "fog line" is the line on the side of the highway that separates the highway from the shoulder, marking the end of the highway's outside lane.

[2] O.C.G.A. § 40–8–26 states, in pertinent part:

(a) Any motor vehicle may be equipped . . . with the following signal lights or devices:

. . . .

(2) A light or lights or mechanical signal device capable of clearly indicating any intention to turn either to the right or to the left and which shall be visible from both the front and the rear.

(b) Every . . . signal light or lights indicating intention to turn shall be visible and understandable during daytime and nighttime from a distance of 300 feet from both the front and the rear.  . . .  [S]uch light or lights shall at all times be maintained in good working condition.

[3] O.C.G.A. § 40–6–48 states, in pertinent part:

to step out of his car and accompany him to the patrol car while he wrote the warning ticket.

While writing the ticket, McCannon asked the dispatcher to run a check on Campbell's license and engaged Campbell in conversation. He learned that Campbell was en route to Augusta to see his family, where Campbell worked, that Campbell had been arrested sixteen years ago for a DUI, and that Campbell was not traveling with a firearm. Then he asked Campbell if he had any counterfeit CDs or DVDs, illegal alcohol, marijuana, cocaine, methamphetamine, heroin, ecstasy, or dead bodies in his car. Campbell answered that he did not. At that time, McCannon asked Campbell if he could search his car for any of those items, and Campbell consented.

While McCannon continued writing the warning ticket, Deputy Patrick Paquette, who had arrived on the scene a few minutes earlier, began searching the car. McCannon finished the warning ticket and had Campbell sign it. After giving Campbell the ticket and returning his license, McCannon joined Paquette in the search. They found a 9mm semi-automatic pistol, 9mm ammunition, a black

---

Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following rules, in addition to all others consistent with this Code section, shall apply:

(1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.

4

stocking cap, and a camouflage face mask in a bag hidden under the carpet in the Maxima's trunk. Confronted, Campbell admitted that he lied about not traveling with a firearm because he was a convicted felon and had done time.

## B.

Campbell was indicted for possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Following his indictment, he asserted that the evidence found in the search of his car was obtained in violation of the Fourth Amendment's prohibition against unreasonable searches and seizures, and moved the District Court to suppress it.[4] He presented two arguments in support of his motion. First, the seizure was unreasonable because Deputy McCannon lacked reasonable suspicion to believe that a traffic violation had occurred. Second, even if there was reasonable suspicion, his seizure became unreasonable when McCannon prolonged the stop by asking Campbell questions unrelated to the purpose of the stop. In turn, the unreasonable seizure tainted any consent he had given the officers to search his car, requiring that the evidence uncovered during the search be suppressed.[5]

---

[4] The Fourth Amendment states, in pertinent part, that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The Fourth Amendment is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 1692 (1961).

[5] Campbell also argued that the search was tainted because it exceeded the scope of any consent he had given, but this issue is not before us on appeal.

Campbell's first argument was that his rapidly blinking turn signal did not supply reasonable suspicion to make the traffic stop. All that O.C.G.A. § 40–8–26 requires is that the turn signal "indicate a driver's intention to change lanes," and the Maxima's left turn signal was able to do that. That the signal was not blinking as designed was irrelevant, Campbell said, because the statute did not require that a turn signal "(1) blink in unison with the other turn signal, (2) blink at a certain pace, or even, (3) blink as intended by the vehicle manufacturer."[6]

Campbell's second argument was that McCannon unlawfully prolonged the stop by asking questions unrelated to the purpose of the stop. Specifically, he challenged questions on the following topics:

> McCannon asked: (1) where he was going, (2) who he was going to see, (3) where he worked, (4) if he had time off work, (5) when his last traffic ticket was, (6) if he had ever been arrested, (7) how old his car was, (8) how good of a deal he got on his car, (9) whether he had any counterfeit merchandise in the car, and, (10) if he had a dead body in the car.

Relying on the Supreme Court's decision in *Rodriguez*, Campbell maintained that if McCannon prolonged the stop at all through these inquiries, the stop became unlawful.

The District Court held an evidentiary hearing on Campbell's motion to suppress. Deputy McCannon, whom the Government called to the stand at the

---

[6] Campbell also denied that reasonable suspicion existed for allegedly crossing the fog line. The District Court did not reach this argument and neither do we.

outset of the hearing, was the sole witness. Aside from his testimony, the Court had the benefit of the video created by the dashboard camera. The video portrays what transpired between McCannon's activation of the camera and Campbell's arrest, including the questioning Campbell complains of as unrelated to the purpose of the stop. The video's timestamps indicate precisely when this questioning took place. The following bullet points, headed by the timestamps, demonstrate this.

- **0:00:** McCannon activates the camera.
- **2:05–16:** McCannon provides the Sheriff's Office dispatcher with the car's license plate number. The dispatcher runs the number and informs him that it belongs to Erickson Campbell, an "active felon."
- **2:31:** McCannon activates his patrol car's flashing lights.
- **2:36–58:** Campbell pulls over.
- **3:25–32:** McCannon approaches the car from the passenger side and requests Campbell's driver's license.
- **3:34–4:42:** McCannon explains to Campbell that he stopped him for "weaving in his lane" and because his left turn signal was blinking rapidly. McCannon says the rapid blinking means "you've got a bulb out somewhere." He then checks the lights in the front and back of the car, none of which are out. McCannon says it must be that the turn signal is "about to go bad," but that he won't write a ticket for that— just a warning.
- **4:43–5:09:** McCannon asks Campbell where he is going. Campbell says he is traveling to Augusta, Georgia. McCannon asks why he is going there, and Campbell responds that he is going to see his family.
- **5:10–13:** McCannon asks Campbell to step out of the car and walk with him to the patrol car where he will write the warning.
- **5:48:** McCannon begins writing the warning ticket.
- **6:13–29:** McCannon asks Campbell about his family in Augusta, adding that he knows a little about Augusta. Campbell says he does not know much about Augusta; he just has family there. McCannon continues writing the ticket.

7

- **6:30–57:** McCannon asks Campbell what type of work he does. Campbell says that he works for American Woodlawn, building for Home Depot and Lowes.
- **7:07–27:** McCannon asks Campbell where his family lives in Augusta. Campbell responds that his family lives off of Watson Road. McCannon indicates he knows approximately where that is, and continues writing the ticket.
- **7:48–8:30:** McCannon stops writing to retrieve his jacket from the patrol car.
- **8:32–38:** McCannon asks Campbell if he is traveling with a firearm. Campbell shakes his head no.
- **9:07:** McCannon acknowledges Sergeant Paquette, who has just arrived off camera.[7]
- **9:12–18:** McCannon asks Paquette to "come here and let me ask you about this location." McCannon tells Campbell that Paquette is from Augusta.
- **9:31–39:** McCannon calls the dispatcher to run a check on Campbell's driver's license.
- **9:40–54:** McCannon asks Campbell if he had been arrested before. Campbell responds yes, about sixteen years ago, for a DUI.
- **10:00–56:** McCannon and Paquette ask Campbell about his destination and where his family lives in Augusta, while McCannon continues to intermittently write the ticket.
- **11:16–19:** McCannon: "I know I asked you if you have any firearms tonight, and you said 'no.'" Campbell nods and says "yes, sir."
- **11:20–45:** McCannon: "Any counterfeit merchandise that you're taking to your relatives in Augusta? And what I mean by that is—any purses? Shoes? Shirts? Any counterfeit or bootleg CDs or DVDs? Anything like that? Any illegal alcohol? Any marijuana? Any cocaine? Methamphetamine? Any heroin? Any ecstasy? Nothing like that? You don't have any dead bodies in your car?" Campbell shakes his head or otherwise responds in the negative to each question.
- **11:47–55:** McCannon: "I know you said you didn't have that, and I'm not accusing you of anything—can I search it? Can I search your car for any of those items I asked you about?" Campbell responds in the affirmative, nodding and gesturing toward the car.

---

[7] Sergeant Paquette had observed McCannon's encounter with Campbell while patrolling the highway, and had pulled over to assist.

- **12:02–13:05:** Paquette pats down Campbell after McCannon indicates that he had not yet done so.  McCannon continues writing the ticket.
- **13:06:**  Paquette begins searching the car.
- **13:22–44:** McCannon asks Campbell to sign the ticket.  Campbell does so and returns it to McCannon.
- **14:00:**  McCannon hands the ticket to Campbell.
- **16:18–19:58:** McCannon and Paquette search the car.
- **19:58–20:08:** Paquette informs McCannon that he has discovered a gun and a ski mask.
- **20:30–21:02:** The officers finish searching the car and place Campbell in handcuffs.
- **21:25–40:** McCannon informs Campbell of his *Miranda* rights.
- **24:12–48:** McCannon tells Campbell he is under arrest for felon in possession of a firearm.  McCannon places Campbell in the rear of his patrol car to be taken to the Greene County jail.

From the time McCannon began writing the warning ticket to Campbell's consent to the search, a total of 6 minutes and 7 seconds elapsed.  Campbell consented 8 minutes and 57 seconds after McCannon made the stop.

## C.

At the conclusion of the evidentiary hearing, the District Court asked the parties for supplemental briefing to address the possible application of the *Rodriguez* decision.  The District Court also requested supplemental briefing on the applicability of *Davis v. United States*, in which the Supreme Court held that the Fourth Amendment's exclusionary rule should not apply when the police act in good-faith reliance on binding judicial precedent.  564 U.S. 229, 232, 131 S. Ct. 2419, 2423–24 (2011).  After briefing, the Court denied the motion to suppress.

9

The District Court determined that the rapidly blinking turn signal provided reasonable suspicion to stop the car.  Georgia's statute requires turn signals to be in good working condition.  The Court reasoned that McCannon had reasonable suspicion to believe that the rapidly blinking turn signal violated this requirement.  The Court further concluded that McCannon had "reasonable suspicion to initiate the stop to determine whether the front signal lights were functioning properly." The Court based this conclusion on McCannon's testimony that in his experience a rapidly blinking turn signal indicates either a bulb is out or is about to go out.  Given this finding, there was no need to address the failure-to-maintain-lane violation.

After finding reasonable suspicion, the District Court moved to the prolongation issue.  The Court found that precedent entitled McCannon to ask Campbell about his destination and the purpose of his trip; the year his car was made; the last traffic citation he received; his criminal history[8]; and whether he was traveling with a firearm.  As the Court put it, "[t]hese questions either addressed the traffic violation or were related to legitimate safety concerns."

But the questions about contraband, the Court said, were not related to the purpose of the stop.  These questions—about counterfeit merchandise, drugs, and

---

[8] Citing *United States v. Purcell*, 236 F.3d 1274, 1280 (11th Cir. 2001), the Court held that McCannon "lawfully asked Defendant about his criminal history while he waited on dispatch to run [Defendant's] license information."

10

dead bodies—and Campbell's negative responses, consumed all of 25 seconds. Immediately thereafter, Campbell consented to the search of his automobile.

Citing our decision in *United States v. Griffin*, 696 F.3d 1354, 1362 (11th Cir. 2012), the Court said the few seconds "McCannon took to ask a few unrelated questions 'did not transform the stop into an unconstitutionally prolonged seizure.'" The Court concluded that the overall length of the stop was reasonable and that McCannon conducted the stop expeditiously. Because the seizure was reasonable, there was no reason for the Court to decide whether the consent was tainted or the good faith exception to the exclusionary rule applied.

Following the Court's ruling, Campbell entered a conditional guilty plea, preserving the right to appeal the denial of his motion to suppress. *See* Fed. R. Crim. P. 11(a)(2). He lodged this appeal after the Court imposed a 28-month sentence.

## II.

"A denial of a motion to suppress involves mixed questions of fact and law." *United States v. Spivey*, 861 F.3d 1207, 1212 (11th Cir. 2017) (quotation omitted). We review the District Court's findings of fact for clear error, considering all the evidence in the light most favorable to the prevailing party—in this case, the Government. *Id.* But we review *de novo* the District Court's application of the law to those facts. *United States v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir.

11

2010). Our review is not moored to the evidence presented at the suppression hearing; we are free to look at the whole record. *United States v. Newsome*, 475 F.3d 1221, 1224 (11th Cir. 2007).

### A.

A traffic stop is a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10, 116 S. Ct. 1769, 1772 (1996). To comply with the Fourth Amendment, the officer must have reasonable suspicion. *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014) ("All parties agree that to justify [a traffic stop], officers need only reasonable suspicion[.]" (quotation omitted)).[9] That is, the officer must have "a particularized and objective basis for suspecting the person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396, 134 S. Ct. 1683, 1687 (2014). Criminal activity includes even minor traffic violations. *See United States v. Chanthasouxat*, 342 F.3d 1271, 1277 (11th Cir. 2003). The question here is whether a rapidly blinking turn signal creates reasonable suspicion that a traffic violation has occurred.

---

[9] The parties and the District Court mention needing reasonable suspicion or probable cause. This framing is understandable given the Supreme Court's declaration in *Whren* that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810, 116 S. Ct. at 1772. We have also echoed that standard. *See United States v. Pierre*, 825 F.3d 1183, 1192 (11th Cir. 2016) ("Pursuant to the Fourth Amendment, police may stop a vehicle if they have probable cause to believe that a traffic violation has occurred."). But the Supreme Court has since made it plain that reasonable suspicion is all that is required. *See Heien*, 135 S. Ct. at 536. While probable cause is sufficient, only reasonable suspicion is necessary.

Georgia law requires that a vehicle be equipped with right and left turn signal lights. O.C.G.A. § 40–8–26(a)(2). Such lights must clearly indicate an intention to turn right or left and be visible from the front and rear from a distance of 300 feet. In addition, such lights "shall at all times be maintained in good working condition." *Id.* §§ 40–8–26(a)(2), (b). As the District Court noted, the good working condition requirement is separate. If all the statute demanded is that the turn signal be visible from 300 feet and clearly indicate an intention to change lanes, the good working condition language would be superfluous. It must mean more.

Typically, when a turn signal blinks rapidly, it does so to notify the driver that a bulb is out or is about to go out. It can also mean that there is a problem with the wiring. Campbell maintains that a rapidly blinking turn signal works as intended—to notify the driver of a potential problem—and equipment that works according to design must be in good working condition. But the rapid blinking is an alert that something, be it an expired bulb or faulty wiring, might not be in good working condition. Thus, the rapidly blinking turn signal provided McCannon with reasonable suspicion to believe that Campbell's car was in violation of the traffic code. On that basis,[10] we affirm the District Court's holding that

[10] The District Court also noted that even if McCannon was mistaken that the rapidly blinking turn signal violated the "good working condition" requirement of O.C.G.A. § 40–8–26,

13

McCannon's initiation of the stop was lawful and proceed to the issue of whether his unrelated inquiries turned Campbell's seizure into a Fourth Amendment violation.

### B.

Even if the police have reasonable suspicion to make a traffic stop, they do not have unfettered authority to detain a person indefinitely. The detention is "limited in scope and duration." *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1326 (1983) (plurality opinion). Officers must conduct their investigation diligently. *See Rodriguez*, 135 S. Ct. at 1616 ("[T]he Government acknowledges that an officer always has to be reasonably diligent." (quotation omitted)); *see also United States v. Place*, 462 U.S. 696, 709, 103 S. Ct. 2637, 2645 (1983) ("[I]n assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation."). And officers cannot unlawfully prolong a stop. *See Rodriguez*, 135 S. Ct. at 1614–16.

The Supreme Court expanded on unlawfully prolonged traffic stops in *Rodriguez*. In that case, police pulled over a vehicle for swerving onto the shoulder. *Id.* at 1612. After writing a warning ticket and returning the license, registration, and proof of insurance to the driver, the officer made the driver and

---

his mistake would be a reasonable mistake of law and thus "give rise to the reasonable suspicion necessary" to validate the stop and uphold the seizure. *See Heien*, 135 S. Ct. at 536.

14

passenger wait for seven or eight minutes while he conducted a dog sniff. *Id.* at 1613. The dog discovered contraband, and the driver sought to suppress the evidence. *Id.* On appeal, the Eighth Circuit determined that a seven or eight minute delay is a permissible *de minimis* intrusion. *Id.* at 1614. But the Supreme Court rejected the *de minimis* standard. *Id.* at 1615–16.

The Supreme Court explained that a traffic stop is analogous to a *Terry* stop. *Id.* at 1614. As such, the scope of the stop "must be carefully tailored to its underlying justification." *Id.* (quoting *Royer*, 460 U.S. at 500). Thus, in the context of a traffic stop, "the tolerable duration of police inquiries . . . is determined by the seizure's mission[.]" *Rodriguez*, 135 S. Ct. at 1614 (quotation omitted). The mission of a traffic stop is "to address the traffic violation that warranted the stop . . . and attend to related safety concerns[.]" *Id.* The stop may "last no longer than is necessary" to complete its mission. *Id.* (quoting *Royer*, 460 U.S. at 500). In other words, "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*

The question becomes, which tasks are related to the stop's purpose? The Court identified a number of tasks it says are "ordinary inquiries incident to [the traffic] stop." *Id.* at 1615 (alteration in original). These inquiries include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of

15

insurance." *Id.* Inquiries such as these ensure "that vehicles on the road are operated safely and responsibly." *Id.*

The Court has also identified tasks that are not related to a stop's purpose. In *Arizona v. Johnson*, for example, the Court said asking about a passenger's gang affiliation is not related. *See* 555 U.S. 323, 332, 129 S. Ct. 781, 787 (2009). Similarly, using a dog to search for contraband is not related. *Rodriguez*, 135 S. Ct. at 1615. A dog sniff lacks "the same close connection to roadway safety as the ordinary inquiries," and cannot be "fairly characterized as part of the officer's traffic mission." *Id.* Instead, a dog sniff is "aimed at detect[ing] evidence of ordinary criminal wrongdoing." *Id.* (alteration in original) (citation omitted).

In short, related tasks are the "ordinary inquiries incident to a traffic stop"; unrelated tasks are "other measures aimed at detecting criminal activity more generally." *See United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (interpreting *Rodriguez*).

That said, unrelated inquiries are permitted so long as they do not add time to the stop. *Rodriguez*, 135 S. Ct. at 1615 ("An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent . . . reasonable suspicion."). This seems counterintuitive: how could an officer conduct unrelated inquiries without adding at least some time to the stop? Precedent provides the answer.

16

In *Illinois v. Caballes*, an officer making a stop radioed dispatch to report it. 543 U.S. 405, 406, 125 S. Ct. 834, 836 (2005). A second officer "overheard the transmission and immediately headed for the scene with his narcotics-detection dog." *Id.* The second officer conducted the dog sniff while the first officer "was in the process of writing a warning ticket[.]" *Id.* Thus, because there were multiple officers, one of them was able to conduct an unrelated inquiry without adding time to the stop.

Similarly, in *Johnson*, three officers pulled over a car with three passengers. 555 U.S. at 327, 129 S. Ct. at 784. While one officer made the ordinary inquiries into the driver's license and registration, another officer questioned the passenger, Johnson. *Id.* at 327–28. This officer made unrelated inquiries into whether Johnson was affiliated with a gang, *id.* at 328, but because the first officer simultaneously followed up on the purpose of the stop, it did not add any time.

In this way, the *Rodriguez* Court suggested that its decision—commanding that a stop "may last no longer than is necessary" to complete its purpose—was a simple application of its precedents. 135 S. Ct. at 1614 ("Our decisions in *Caballes* and *Johnson* heed these constraints. In both cases, we concluded that the Fourth Amendment tolerated certain unrelated investigations *that did not lengthen the roadside detention*." (emphasis added)). But this Court, in conjunction with a

17

number of our sister circuits,[11] had interpreted the precedent cases to establish a different standard.

In *United States v. Griffin*, 696 F.3d 1354 (11th Cir. 2012), we considered the appropriate standard to decide prolongation cases. As part of that consideration, we looked to the Supreme Court's ruling in *Johnson*,[12] where the Court condoned unrelated inquiries "so long as those inquiries do not measurably extend the duration of the stop." *Griffin*, 696 F.3d at 1361 (quoting *Johnson*, 555 U.S. at 333, 129 S. Ct. at 788).[13] Based on the language from *Johnson*, we determined that the issue of whether unrelated questions "measurably extended or

---

[11] Almost all of the circuits developed a rule looking to whether the length of the stop as a whole was reasonable and finding that brief extensions did not transform the stop into an unreasonable seizure. *See United States v. McBride*, 635 F.3d 879, 883 (7th Cir. 2011); *United States v. Everett*, 601 F.3d 484, 492 (6th Cir. 2010); *United States v. Harrison*, 606 F.3d 42, 45 (2d Cir. 2010) *abrogated by United States v. Gomez*, 877 F.3d 76, 89–90 (2d Cir. 2017); *United States v. Chaney*, 584 F.3d 20, 26 (1st Cir. 2009); *United States v. Farrior*, 535 F.3d 210, 220 (4th Cir. 2008) *abrogation recognized by United States v. Williams*, 808 F.3d 238, 246–47 (4th Cir. 2015); *United States v. Turvin*, 517 F.3d 1097, 1101 (9th Cir. 2008); *United States v. Olivera-Mendez*, 484 F.3d 505, 510–11 (8th Cir. 2007); *United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007).

[12] We also looked to the Supreme Court's decision in *Muehler v. Mena*, 544 U.S. 93, 125 S. Ct. 1465 (2005). *See Griffin*, 696 F.3d at 1360–61. In *Mena*, an officer questioned "a person about her immigration status while she was detained during the execution of a search warrant— by other law enforcement officers—for deadly weapons and evidence of gang membership." *Id.* (citing *Mena*, 544 U.S. at 95–6, 125 S. Ct. at 1468). Because the questioning did not prolong the detention, the Court held that the officers did not need independent reasonable suspicion to ask about her immigration status. *Mena*, 544 U.S. at 101, 125 S. Ct. at 1471. Thus, *Mena* is fully consistent with the idea that unrelated inquiries are permitted only if they do not add time to the stop. The unrelated questions did not prolong the stop because other officers executed the search warrant.

[13] The standard from *Johnson* resembled the one from *Caballes*, where the Court said a traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Caballes*, 543 U.S. at 407, 125 S. Ct. at 837.

18

prolonged the duration of the stop so as to make it unreasonable under the Fourth Amendment" should be decided by an overall reasonableness standard. *Id.* at 1362 ("To address this issue, we do not simply look at the interval of prolongation in isolation, but rather assess the length of the stop as a whole, including any extension of the encounter, by undertaking a fact-bound, context-dependent analysis of all of the circumstances concerning the stop and the unrelated questions." (quotation omitted)).

But the Supreme Court rejected the overall reasonableness standard in *Rodriguez.* In that case, the Government argued that it is acceptable to "incremental[ly] prolong a stop" for unrelated inquiries so long as the officer is diligent "*and the overall duration of the stop remains reasonable*[.]" *Rodriguez*, 135 S. Ct. at 1616 (alteration in original) (emphasis added) (quotation omitted). The Court disagreed, noting that the Government's position would effectively grant officers "bonus time to pursue an unrelated criminal investigation" if they complete the "traffic-related tasks expeditiously[.]" *Id.* That cannot be right. Instead, courts must look at what an officer actually does: if he "can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.'" *Id.* (alteration in original) (quoting *Caballes*, 543 U.S. at 407, 125 S. Ct. at 837). And "a traffic stop prolonged

beyond that point is unlawful." *Id.* (quotation omitted). Put differently, a stop can be unlawfully prolonged even if done expeditiously.

The Supreme Court also rejected the reasoning from *Griffin*. In *Griffin*, an officer stopped and frisked a person suspected of theft. *Griffin*, 696 F.3d at 1357. During the frisk, the officer asked the suspect: "Hey, what's in your pocket? Why do you have batteries?" *Id.* These questions were "unrelated to the attempted theft or the frisk for weapons," *id.* at 1358, and prolonged the stop by about 30 seconds, *id.* at 1362. We offered two reasons for finding that the stop was not unlawfully prolonged. *Id.* First, the officer "acted diligently." *Id.* But as explained above, diligence does not provide an officer with cover to slip in a few unrelated questions. Second, the officer "had not yet completed his investigation." *Id.* The *Rodriguez* Court rebuffed this argument as well: the "critical question . . . is not whether the [unrelated inquiry] occurs before or after the officer issues the ticket . . . but whether conducting the [unrelated inquiry] 'prolongs'—*i.e.*, adds time to—'the stop.'" *Rodriguez*, 135 S. Ct. at 1616. In other words, an officer can prolong a stop before or after completing the investigation.

Neither can *Griffin* be distinguished because of the time difference. Although the unrelated questions in *Griffin* prolonged the stop by about 30 seconds, *Griffin*, 696 F.3d at 1362, and the dog sniff in *Rodriguez* prolonged the stop by seven to eight minutes, *Rodriguez*, 135 S. Ct. at 1613, the Supreme Court

20

was clear that the length of time is immaterial.  The Court rejected the Eighth

Circuit's *de minimis* rule, under which minor extensions of seizures were tolerated.

*See id.* at 1615–16.  To differentiate *Griffin* on the grounds that a 30 second delay

is less serious than a seven minute delay would revive a standard—be it

characterized as a *de minimis* rule or as overall reasonableness—that the Supreme

Court specifically rejected.

Bottom line: *Griffin* cannot be squared with *Rodriguez*.  Accordingly, we

find that *Rodriguez* abrogates *Griffin*.

Still, Campbell's interpretation of *Rodriguez* goes too far.  He suggests, for

example, that the officer unlawfully prolonged the stop by taking a few seconds to

retrieve his coat or by looking Campbell in the eye while they conversed rather

than exclusively focusing on writing the ticket.  But *Rodriguez* does not prohibit all

conduct that in any way slows the officer from completing the stop as fast as

humanly possible.[14]  It prohibits prolonging a stop *to investigate other crimes*.  *Id.*

at 1616 ("On-scene investigation into other crimes . . . detours from that

---

[14] Of course, the officer could be so slow as to warrant a claim that the officer was not diligent.  As the *Rodriguez* Court noted, "an officer always has to be reasonably diligent." *Rodriguez*, 135 S. Ct. at 1616 (quotation omitted).  On that question, there is still no bright-line time limit on how long a stop can last before it becomes an unreasonable seizure.  *See United States v. Sharpe*, 470 U.S. 675, 685, 105 S. Ct. 1568, 1575 (1985) ("Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop.  But our cases impose no rigid time limitation on *Terry* stops."); *see also Place*, 462 U.S. at 709, 103 S. Ct. at 2646 ("[W]e decline to adopt any outside time limitation for a permissible *Terry* stop[.]").

21

mission."). The problem with the dog sniff was that it was "a measure aimed at detecting evidence of ordinary criminal wrongdoing." *Id.* at 1615 (quotation omitted). And efforts to "detect crime in general or drug trafficking in particular" are "different in kind" from interests in highway and officer safety. *Id.* at 1616.

We think the proper standard emanating from *Rodriguez* is this: a stop is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other crimes. *See id.* at 1614–16; *see also Greene*, 897 F.3d at 179. That is, to unlawfully prolong, the officer must (1) conduct an unrelated inquiry aimed at investigating other crimes (2) that adds time to the stop (3) without reasonable suspicion.

Most circuits that have addressed *Rodriguez* have reached a similar conclusion. *See United States v. Stewart*, 902 F.3d 664, 674 (7th Cir. 2018) (suggesting that 75 seconds used to call for backup might unlawfully prolong the stop, but the record was inadequate to determine if the officer's purpose was for safety or a dog sniff), *reh'g en banc denied* (Oct. 26, 2018); *United States v. Clark*, 902 F.3d 404, 410–11 (3d Cir. 2018) (finding that 20 seconds of unrelated questioning prolonged the stop); *United States v. Bowman*, 884 F.3d 200, 219 (4th Cir. 2018) (finding that officer did not have consent or reasonable suspicion to question passenger after mission completed); *United States v. Gomez*, 877 F.3d 76, 88–93 (2d Cir. 2017) (concluding that it is not a reasonableness test but whether

22

the unrelated inquiry adds time to the stop at all, and finding that asking a few questions about drugs prolonged the stop); *United States v. Gorman*, 859 F.3d 706, 715 (9th Cir. 2017) (holding that unrelated questioning prolonged the stop); *United States v. Macias*, 658 F.3d 509, 518–19 (5th Cir. 2011) (deciding that unrelated questions violated the standard which says an officer can ask such questions only if they do not extend the duration of the stop). *But see United States v. Collazo*, 818 F.3d 247, 257–58 (6th Cir. 2016) (using language suggesting an overall reasonableness standard).

With this understanding of *Rodriguez*, we address the case at hand. On appeal, Campbell points to several actions that he maintains prolonged the stop. First, he identifies the numerous questions McCannon asked about his travel plans. McCannon spent approximately two minutes asking Campbell where he was going and why. We find that these questions were related to the purpose of the stop.

Generally, questions about travel plans are ordinary inquiries incident to a traffic stop. *See United States v. Dion*, 859 F.3d 114, 125 (1st Cir. 2017) ("[O]ur case law allows an officer carrying out a routine traffic stop . . . to inquire into the driver's itinerary."), *cert. denied*, 138 S. Ct. 346 (2017); *United States v. Bowman*, 660 F.3d 338, 343 (8th Cir. 2011) (stating that tasks related to a traffic violation include "inquiring about the occupants' destination, route, and purpose"); *United States v. Brigham,* 382 F.3d 500, 508 (5th Cir. 2009) (en banc) ("An officer may

also ask about the purpose and itinerary of a driver's trip during the traffic stop.");

*United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003) ("[Q]uestions relating to

a driver's travel plans ordinarily fall within the scope of a traffic stop."); *United*

*States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001) ("[W]e have repeatedly

held (as have other circuits) that questions relating to a driver's travel plans

ordinarily fall within the scope of a traffic stop.").

More specifically, in this case, Campbell's travel plans were relevant to the

traffic violation—a malfunctioning turn signal.  In McCannon's experience, a

rapidly blinking turn signal indicates that a bulb is either out or is about to go out.

Since Campbell was traveling for a long distance, the chances that his turn signal

would stop working while he was driving increased accordingly.  For this reason,

asking about Campbell's travel plans was a related and prudent part of

investigating his malfunctioning turn signal.[15]

Campbell also argues that the questions about whether he had contraband in

his car unlawfully prolonged the stop.  Just before asking for Campbell's consent

to search the car, McCannon queried:

> "[Do you have] any counterfeit merchandise that you are taking to
> your relatives over there in Augusta? And what I mean by that is--any

---

[15] Admittedly, McCannon acknowledged that the reason he took such interest in Campbell's destination was because that part of Augusta was a high crime area.  But in this area of the law, we do not consider officers' subjective motivations.  *See Whren*, 517 U.S. at 813, 116 S. Ct. at 1774.

24

purses? Shoes? Shirts? Any counterfeit or bootleg CDs or DVDs or anything like that? Any illegal alcohol? Any marijuana? Any cocaine? Methamphetamine? Any heroin? Any ecstasy? Nothing like that? You don't have any dead bodies in your car?"

These questions were not related to a traffic stop for a malfunctioning turn signal and allegedly crossing the fog line. These questions were inquiring about "crime in general [and] drug trafficking in particular." *See Rodriguez*, 135 S. Ct. at 1616. They added 25 seconds to the stop. And the Government does not contend that McCannon had reasonable suspicion. Consequently, we find that these questions unlawfully prolonged the stop.

### C.

Normally, if an officer unlawfully prolongs a stop, any evidence uncovered as a result would be suppressed. *See Davis*, 564 U.S. at 231–32, 131 S. Ct. at 2423. But the exclusionary rule is subject to exceptions. *Id.* at 236–38, 131 S. Ct. at 2426–27. [16]

*Davis* excepts from the exclusionary rule evidence the police obtain in searches conducted "in objectively reasonable reliance on binding appellate precedent[.]" *Id.* at 232, 131 S. Ct. at 2423–24. This is because the "sole purpose"

---

[16] As an aside, we cannot use the good faith exception to avoid deciding whether there was a constitutional violation. To do so would deny the retroactive effect of constitutional criminal procedure. *See Davis*, 564 U.S. at 243–44, 131 S. Ct. at 2430–31 ("[T]he retroactive application of a new rule of substantive Fourth Amendment law *raises* the question whether a suppression remedy applies; it does not answer that question.").

of the exclusionary rule is to deter Fourth Amendment violations, *id.* at 236, 131 S. Ct. at 2426, and suppressing evidence obtained from a search that was lawful when conducted would "do nothing to deter" police wrongdoing while coming "at a high cost to both the truth and the public safety," *id.* at 232, 131 S. Ct. at 2423.

At the time of Campbell's arrest, *Griffin* was our last word on the issue and the closest precedent on point. *Griffin*, 696 F.3d 1354. As noted above, *Griffin* held that an officer's unrelated questioning lasting no more than 30 seconds did not unconstitutionally prolong the stop because the officer "had not yet completed his investigation . . . and because he acted diligently[.]" *Id.* at 1362.

The facts here fit squarely within *Griffin*'s parameters. McCannon lawfully stopped Campbell to investigate a traffic violation. His unrelated questions lasted 25 seconds. He asked them before he had completed the stop by issuing the warning ticket. And the District Court found that McCannon "diligently investigated" the traffic violations and "expeditiously" completed the citations. We cannot say the District Court clearly erred in so finding. As such, *Griffin* controls, and McCannon acted in "objectively reasonable reliance on binding appellate precedent[.]" *Davis*, 564 U.S. at 232, 131 S. Ct. at 2423–24.

## D.

The Government, which is the appellee here, did not raise the applicability of the good faith exception on appeal, although the issue was briefed in the District

26

Court at the District Court's specific request.  Even assuming the Government waived the good-faith issue by failing to raise it in its brief,[17] we still dispose of this appeal on good-faith grounds because the issue was resolved, as a matter of law, by our analysis of the issue properly before us—i.e., the constitutionality of the search.

To elaborate, our analysis makes clear that the search was permissible, as a matter of law, under binding precedent at the time it occurred, *see Griffin*, 696 F.3d at 1362, and the law presumes that an officer's actions, which objectively comply with binding precedent, were done in good faith, *see Whren v. United States*, 517 U.S. 806, 813–14, 116 S. Ct. 1769, 1774–75 (1996) (stating that we do not view an officer's actions based on subjective intent, but rather based on whether the actions were objectively legally justifiable based on the circumstances).  Therefore, our

---

[17] Because this is a criminal case, the Government could not have raised a good-faith argument in a cross appeal.  Wayne R. La Fave et al., Criminal Procedure § 27.3(b) (4th ed. 2015) (noting that the Government can only cross appeal with statutory authorization, and stating that "the primary authorization for appeals by the government in the federal courts is the Criminal Appeals Act"); *see also* 18 U.S.C.A. § 3731 (listing the few circumstances under which the government may cross appeal).  Furthermore, it is worth noting, even if the Government could have filed a motion for reconsideration following the District Court's judgment—which is not clear, in part because the Federal Rules of Criminal Procedure do not provide a rule equivalent to Fed. R. Civ. P. 59(e)—the motion almost certainly would have been denied.  *See United States v. Gossett*, 671 F. App'x 748, 749 (11th Cir. 2016) ("We have not addressed in a published opinion under what circumstances a district court should grant a motion to reconsider in a criminal case.  In civil cases, a motion for reconsideration cannot be used to relitigate old matters, raise arguments, or present evidence that could have been raised prior to the entry of judgment, including new arguments that could have been raised but were not." (citing *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 957 (11th Cir. 2009))).  Thus, the only way the Government could have raised the good-faith issue on appeal is by including it in its appellate brief.

analysis of the constitutionality of the search resolved the good-faith issue in the Government's favor as a matter of law, and we are not required to turn a blind eye to the resolution of that issue merely because the issue was waived.

1.

Waiver is a prudential doctrine, not a jurisdictional limitation. *United States v. Castellanos*, 608 F.3d 1010, 1015 (8th Cir. 2010). The degree to which we adhere to the doctrine and the conditions under which we will excuse it is up to the appellate court. J. Dickson Phillips, Jr., *The Appellate Review Function: Scope of Review*, 47 Law & Cont. Probs. 1, 3 (1984); *see also Singleton v. Wulff*, 428 U.S. 106, 121, 96 S. Ct. 2868, 2877 (1976).

In the criminal context, we have held that we will only reach a waived issue if it constitutes a manifests injustice. *United States v. Tamayo*, 80 F.3d 1514, 1521 (11th Cir. 1996). We equate manifest injustice to plain error. *United States v. Quintana*, 300 F.3d 1227, 1232 (11th Cir. 2002) (citations omitted), *abrogated on other grounds by United States v. Doyle*, 857 F.3d 115 (11th Cir. 2017). As an initial matter, since the Government could not cross-appeal the District Court's failure to address the good faith exception, we could not apply the manifest injustice rule on the Government's behalf. Aside from that, the manifest injustice rule is not suited for cases like the instant one. Plain error review is inapplicable here because there is nothing to review—the good faith exception was properly

28

before the District Court, but the District Court did not reach it.  There can be no error, plain or otherwise, when there is no ruling on the issue in point.

Accordingly, we must decide, in the criminal context, when, if ever, we will entertain arguments raised below but not briefed by the Government in an appeal challenging the defendant's conviction.  Without announcing a bright-line rule, we hold that we can review the applicability of the waived good-faith issue here because of the narrow posture of this case[18] and because the waived issue is resolved, as a matter of law, by our analysis of the constitutionality of McCannon's search in this case.  Multiple policy considerations bolster this conclusion.

### 2.

The waiver doctrine upholds the principle that "appellate courts do not sit as self-directed boards of legal inquiry and research."  *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983).  Instead, our appellate courts are passive, neutral decisionmakers.  *See* Stephan Landsman, *Readings on Adversarial Justice: The American Approach to Adjudication*, 2 (1988).  Here, our analysis of the issue properly raised by the parties—i.e., the constitutionality of McCannon's search— resolves the waived issue—i.e., whether McCannon was acting in good faith on

---

[18] Specifically, (1) the good-faith argument was raised and briefed by both parties in the District Court, at the District Court's request; (2) the District Court did not reach the issue, even though it was an adequate alternative basis for the denial of the motion to suppress; and (3) the Government did not explicitly raise the issue in its brief on appeal.

binding precedent when he executed the search—as a matter of law.  Therefore, we remain passive and neutral, without becoming a self-directed board of legal inquiry, even though we dispose of the case on an issue that was technically waived on appeal.

Below, the District Court held that *Rodriguez* did not disturb *Griffin*.[19]  In determining whether the Court erred, we necessarily have to decide, first, what police conduct was constitutional under *Griffin*, and, second, whether *Rodriguez* conflicts with the conclusion of *Griffin*.  Because we have to decide what was constitutional under *Griffin* first, we necessarily have an answer to whether the good faith exception applies to McCannon's search because we presume that a police officer acting in accordance with the law in place at the time of his conduct is doing so in good-faith reliance on the binding law, regardless of the officer's subjective intent.  *See Whren*, 517 U.S. at 813–14, 116 S. Ct. at 1774–75; *Davis*, 568 U.S. at 238–39, 131 S. Ct. at 2427–48 (describing the good faith exception as an objective test).  As such, because the analysis of the issue properly before us made clear, as a matter of law, that McCannon's search was permissible under *Griffin*, which was the controlling precedent at the time, the search also was done

---

[19] *Rodriguez* had not yet been issued when McCannon conducted the search of Campbell. *Griffin* was thus the binding precedent regarding the prolongation of a search at the time.

30

in good faith, as a matter of law, under *Davis*.[20]  As such, we will not pretend that this purely legal issue has not been resolved merely because it was technically waived by the Government.  The prudential waiver doctrine does not require us to close our eyes to a purely legal conclusion that jumps off the page as a result of the analysis of the issues properly raised on appeal.

3.

Multiple additional policy considerations buttress our conclusion that we need not ignore the legal conclusion that the good faith exception to the exclusionary rule applies here.

First, there are no concerns about judicial economy here because the good-faith issue is a pure question of law.  Moreover, it is a pure question of law that has already been resolved by our analysis of the other issue before us.  Therefore, it is hard to imagine a situation in which less judicial energy would be required to resolve an issue not raised by the parties.[21]

---

[20] Importantly, therefore, resolution of the waived issue required no additional legal research or inquisition on one party's behalf.

[21] Judicial economy is mainly a concern when the waived issue is fact-bound.  For example, when a fact-bound issue is raised for the first time on appeal, considering the issue is inefficient; the appellate court might need to hold the appeal in abeyance while retaining jurisdiction, remand the case to the trial court so the material facts can be determined, and armed with the trial court's findings, resume the appeal.  This is the opposite case—no judicial energy is wasted when the issue is purely legal and is resolved by our analysis of the non-waived issues.

31

Second, in these circumstances, i.e., where a district court has multiple alternative arguments before it and decides the issue only on one ground, we are reluctant to reverse a district court on a purely legal issue when it reaches the correct result, even if it applies faulty reasoning or rests the decision on an incorrect ground. If we were to reverse and remand the case without deciding the waived issue, the district court would be precluded from considering it on remand, because once we deem an issue waived, the law of the case doctrine dictates that it is waived for all future stages of the same litigation. *See Piambino v. Bailey*, 757 F.2d 1112 (11th Cir. 1985).[22] Therefore, in effect, the parties here would have stripped the District Court of the ability to rest its judgment on an adequate alternative ground—an alternative ground that the District Court required the parties to brief and upon which the Court could have relied in deciding Campbell's motion to suppress.

Third, a primary concern contemplated by the waiver doctrine is notice. A party is due fair notice regarding what issues are at play on appeal. Because the District Court specifically asked for supplemental briefing on the good faith issue here, Campbell had notice that the issue was potentially relevant. Ideally,

---

[22] In this case, for instance, were we to leave the good-faith issue unanswered and reversed the District Court's suppression ruling, Campbell would move the District Court to enforce the mandate of our judgment, which effectively treated the Government's good-faith argument as abandoned and thus rejected on the merits.

32

Campbell would have had an opportunity to re-argue the applicability of the good faith exception in his reply brief on appeal. However, we have at our disposal the arguments the appellant made before the District Court. This relieves some of the concerns about notice because we are not inventing arguments for Campbell. Instead, we are relying on the arguments he already made on the issue.

4.

Accordingly—while emphasizing that our holding in this case is a narrow one, limited to the unique procedural circumstances presented here—we hold that we may reach the good faith exception because the issue was resolved, as a matter of law, by our analysis of the issue properly before us.

III.

Deputy McCannon had reasonable suspicion to stop Campbell for a traffic violation. He unlawfully prolonged the stop when he asked unrelated questions without reasonable suspicion about whether Campbell was trafficking contraband. Because these questions were permitted under binding precedent at the time, however, the good faith exception applies, and we decline to invoke the exclusionary rule. Thus, there is no need to consider whether Campbell's consent

purged the taint from the unlawfully prolonged seizure.[23]  Nor do we reach the

question of whether the consent issue was waived.

**AFFIRMED.**

---

[23] When a stop is unlawfully prolonged, the seizure becomes unconstitutional, and any subsequent discovery of evidence produced by that seizure would normally be tainted.  However, if the defendant consents to the search after the stop is unlawfully prolonged but before the evidence is discovered, the consent can purge the taint.  *See United States v. Santa*, 236 F.3d 662, 676 (11th Cir. 2000).  To do this, the Government must show (1) that the consent is voluntary and (2) that the consent is not a product of the illegal seizure.  *United States v. Delancy*, 502 F.3d 1297, 1308 (11th Cir. 2007).  Since the evidence from McCannon's search is admissible under the good faith exception, we are spared from pursuing this analysis.

MARTIN, Circuit Judge, concurring in part and dissenting in part:

The Majority is right that, under the Supreme Court's decision in Rodriguez v. United States, 575 U.S. __, 135 S. Ct. 1609 (2015), the patrolman here unlawfully prolonged the traffic stop of Mr. Campbell. Maj. Op. at 23–25. It is also true that our Court's decision in United States v. Griffin, 696 F.3d 1354 (11th Cir. 2012), which established this court's pre-Rodriguez standard for prolongation, cannot be squared with the Supreme Court's subsequent ruling in Rodriguez. Maj. Op. at 18–21.

I write separately from the Majority, however, because in contrast to the result reached in the Majority opinion, I believe Mr. Campbell should prevail. I would not apply the exclusionary rule's good faith exception to affirm the District Court's denial of Mr. Campbell's suppression motion because the Government never made that argument on appeal. Indeed, the government did not make this argument despite having been put on notice of the issue by the District Court and having ample opportunity to raise it. Due to the government's waiver of this argument, I would suppress evidence derived from the unlawfully prolonged traffic stop of Mr. Campbell as fruit of the poisonous tree.

Under this Court's precedent, "a party seeking to raise a claim or issue on appeal must plainly and prominently so indicate. Otherwise, the issue—even if properly preserved at trial—will be considered abandoned." United States v.

35

Jernigan, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003); see also Access Now, Inc. v.

Sw. Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004) ("[T]he law is by now well

settled in this Circuit that a legal claim or argument that has not been briefed

before the court is deemed abandoned and its merits will not be addressed.").  Our

Court regularly applies this rule to bar arguments criminal defendants and pro se

plaintiffs made in the trial court but neglected to raise again on appeal.  See, e.g.,

Hall v. Thomas, 611 F.3d 1259, 1284 n.37, 1289 n.40, 1290 n.41 (11th Cir. 2010)

(holding a juvenile sentenced to life imprisonment waived certain arguments raised

in his habeas petition by failing to reassert them on appeal); Timson v. Sampson,

518 F.3d 870, 874 (11th Cir. 2008) (per curiam) ("While we read briefs filed by

pro se litigants liberally, issues not briefed on appeal by a pro se litigant are

deemed abandoned." (citation omitted)); cf. United States v. Vanorden, 414 F.3d

1321, 1323 & n.1 (11th Cir. 2005) (per curiam) (acknowledging "neither Blakely

nor Booker had been decided" at the time a criminal defendant first appealed his

sentence, but nonetheless holding the defendant abandoned challenges to his

sentence on "Sixth Amendment-Apprendi-Blakely-Booker grounds" by failing to

raise the issue in his first appeal).

    This very case gives insight into this Court's routine reliance upon waiver to

winnow issues presented in the appeals we consider.  Here, both the government

and this panel suggested at oral argument that Mr. Campbell might have waived

36

his fruit-of-the-poisonous tree argument because, although plainly mentioned in his opening brief, the issue was not separately listed as a claim in Campbell's "Statement of Issues." See Oral Arg. at 11:36–11:44 ("We have a hard-and-fast rule in this Circuit. It's pretty punitive, really. That if you don't put it in the brief as an issue, we don't consider it." (comment of Judge Tjoflat)), 13:40–14:20 (government arguing the Court should deem waived issues not prominently raised in a brief, because "[w]hen we're coming before this Court it's important that we know as the responding party, as the appellee, what issues the appellant believes are germane").

Nevertheless, the Majority affirms the District Court's denial of Mr. Campbell's suppression motion on the good faith exception, an argument the government never asserted on appeal. To be clear, the government did not argue the good faith exception in its initial brief, at oral argument, or in any supplemental filing. Yet the Majority invokes the good faith exception based on briefing the parties submitted in District Court, at the explicit direction of that court.

The Majority also holds that the application of the good faith exception to this case is "plain." Maj. Op. at 28. I must say, it is not "plain" to me. The government is a sophisticated, often-appearing party before this Court. As such, the government should be left to the decisions it makes about what arguments it wants us to consider. We know the government was aware of the issue of the

"good faith exception" here, because the District Court specifically requested briefing on the subject.  Under the circumstances, I would not reach out to decide Mr. Campbell's fate on a ground abandoned by the government.

Neither would I affirm on the ground Mr. Campbell consented to the unlawfully-prolonged search.  The Majority did not reach this issue because it concluded the evidence was admissible under the good faith exception.  Maj. Op. at 5 & nn.5, 17.  However, just as the government never raised the good faith exception, it neglected to mention the possibility of Mr. Campbell's consent until this Court prompted it to do so.  See Order Denying Mot. to Suppress at 14 ("The Government, however, does not argue, nor does the evidence establish, that Deputy McCannon had reasonable suspicion of criminal activity beyond the traffic violations to detain Defendant or that the encounter had become consensual before Defendant gave consent to search his vehicle.").[1]  "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily."  United States v. Yeary, 740 F.3d 569, 581 (11th Cir. 2014) (quotation marks omitted).  The government's failure to raise Mr. Campbell's

---

[1] Even though the government failed to raise consent before the District Court, the District Court nonetheless briefly addressed the issue, finding that because "Deputy McCannon retained [Mr. Campbell's] driver's license throughout the encounter, . . . therefore [Mr. Campbell] was not free to leave."

38

consent before the District Court and on appeal means this argument is also waived. See Jernigan, 341 F.3d at 1283 n.8.

I would not put this Court in the business of resuscitating arguments the government was made aware of, then clearly abandoned. In my experience, this Court rarely extends the same courtesy to the criminal defendants and pro se litigants who come before us. Based on the Majority's conclusion that the patrolman unlawfully prolonged the traffic stop, I would reverse the District Court's denial of Mr. Campbell's suppression motion.

I respectfully dissent from the Majority's decision not to suppress the search of Mr. Campbell's automobile.