[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 17-12379, 18-14680

_____

D.C. Docket No. 0:16-cr-60212-WJZ-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ADRIAN TREMAYNE WILSON,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(October 27, 2020)

Before WILLIAM PRYOR, Chief Judge, TJOFLAT and HULL, Circuit Judges.

HULL, Circuit Judge:

After a jury trial, Adrian Tremayne Wilson appeals his conviction and 63-

month sentence for possession of an unregistered, sawed-off shotgun, 26 U.S.C.

§§ 5861(d), 5871.  As to his conviction, Wilson argues that: (1) the federal district court lacked subject matter jurisdiction, or constitutional authority under the Second and Tenth Amendments, to hear his case; (2) the government presented insufficient evidence that he knew his possession of the sawed-off shotgun was unlawful; (3) the district court erred in denying his motion to suppress; and (4) the district court erred in forcing Wilson to represent himself without standby counsel present.  As to his sentence, Wilson contends that the district court erred in calculating his base offense level under U.S.S.G. § 2K2.1(a)(4)(B).  After review, we affirm.

## I.  FACTUAL BACKGROUND

The trial evidence established these events.

### A.    June 12, 2016 Incident & Wilson's Arrest

On June 12, 2016, Officer Jason Palant of the Pembroke Pines Police Department ("Pembroke PD") was on routine patrol in Broward County, Florida. Officer Palant began following a white car that had illegally tinted windows and was speeding with the driver's side door slightly ajar.  As the car headed for a gas station, Palant called Officer Timothy Kincanon (who was at the gas station already) to advise that he wanted to speak to the driver of the white car.

Once parked, Wilson exited the white car and went into the gas station. Officers Kincanon and Palant—wearing police uniforms—tried to speak with

2

Wilson, who cursed at and refused to talk to them.  Officer Palant told Wilson that they were stopping him for traffic infractions—speeding, driving with the door open, and illegal window tint—and repeatedly asked for his driver's license.  Wilson continued to curse and refused to comply.  When ordered either to show his driver's license or be arrested, Wilson said "arrest me."

Officer Palant arrested Wilson for failure to obey a lawful command of a police officer, in violation of Fla. Stat. § 316.072(3).  A search of Wilson's person revealed a valid Florida driver's license in his pocket.  Once in the patrol car, Wilson yelled, moved and jumped around, and threatened Palant.

## B.     Towing and Inventory Search

Because Wilson's car was blocking a gas pump, the officers arranged for a towing and conducted an inventory search pursuant to department policy.  Officer Palant spotted a towel between the driver's and passenger's seats; when he lifted up the corner of the towel, he noticed "a shotgun."  Palant took pictures of the shotgun where he found it in the car.  Officer Kincanon removed the shotgun, which was loaded with four rounds of 12-gauge double aught buck shotgun shells.  The officers took more pictures of the shotgun and the ammunition.  Later, Wilson told another officer that a friend gave him the shotgun, that he did not want to be without a gun in his neighborhood, and that he wanted to clean and refurbish the gun.

3

Before Wilson's car was towed, Officer Palant verified that the windows were illegally tinted and wrote Wilson citations for: (1) unlawfully speeding at 56 miles per hour in a 40-mile-per-hour zone, in violation of Fla. Stat. § 316.189; (2) careless driving by opening the driver's side door while driving, in violation of Fla. Stat. § 316.1925(1); (3) illegally tinted windows, in violation of Fla. Stat. § 316.2952(2); and (4) failing to obey a police officer by refusing to provide a driver's license, in violation of Fla. Stat. § 316.072(3). Palant was trained in speed measurement. His speedometer, radar gun, and tint meter were tested and certified accurate between August 2015 and June 1, 2016.

## C.    Forensic Examination of Firearm & Federal Arrest

The crime lab of the Broward County Sheriff's Office tested the shotgun and confirmed that it was operational. Using a standardized firearm ruler, the crime lab measured the shotgun and found that its barrel length was 14.25 inches and that its overall length was 25 inches, which indicated that it had been sawed off. Officer Palant referred the case to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") for federal prosecution.

An ATF firearms specialist analyzed Wilson's sawed-off shotgun and determined that it was not an "antique" or a "replica of an antique" firearm exempted from registration with the National Firearms Registration and Transfer Record ("NFRTR"). To be an "antique firearm," a weapon must have one of these

characteristics: (1) the weapon was manufactured in or before 1898 and was not designed or redesigned for using rim fire or conventional center fire ignition with fixed ammunition; (2) the weapon is a replica of a matchlock, flintlock, percussion cap, or similar type of ignition system, whether actually manufactured before or after 1898; or (3) the weapon used fixed ammunition manufactured in or before 1898 for which ammunition is no longer manufactured in the United States and is not readily available in the ordinary channels of commercial trade. 26 U.S.C. § 5845(g). Contrastingly: (1) Wilson's sawed-off shotgun was manufactured in Westfield, Massachusetts after 1961; (2) his shotgun was not a replica of any antique ignition system; (3) his shotgun fired modern, fixed ammunition that is readily available in the United States in the ordinary channels of commercial trade; and (4) the ammunition was not loaded like an antique. Wilson had his shotgun loaded with powerful "man-stopper" rounds typically used by law enforcement.[1]

Further, Wilson's shotgun had been modified and thus was of the type that must be registered under the National Firearms Act. A search of the NFRTR database revealed that neither Wilson, nor his company Florida Boys Elite, LLC ("FBE"), had registered the sawed-off shotgun as required. In early August 2016, ATF agents arrested Wilson on a federal charge.

---

[1]The firearms specialist testified that "double aught" refers to the large size of the pellet. Double aught buckshot is designed for large-game hunting and is commonly used by law enforcement because it will knock to the ground a 200-pound man wearing a vest.

D.    **Wilson's Defense at Trial**

At trial, Wilson testified and admitted that he owned, and was in possession of, the shotgun found in his car on June 12, 2016.[2]  Wilson claimed that: (1) he purchased the shotgun at a flea market on the side of the road ten days before his state arrest; and (2) the seller (whose name he did not know) told him it was a replica of an antique 1911 to 1916 shotgun.  Wilson had a purported receipt, or a "bill of sale," for the shotgun.[3]  While "[n]obody gets a receipt in the flea market," Wilson got one for the shotgun so he would not be "up the creek without a paddle."

The bill of sale showed a sale date of June 2, 2016, listed Wilson's FBE company as the buyer, and stated that the shotgun was an "antique short-barrel rifle pump" and a "replica 1911 through 1916."  Wilson conceded that his FBE company was not incorporated until July 21, 2016, over a month after his state arrest.  Wilson, however, denied incorporating his FBE company and forging the bill of sale to support his story.

---

[2]During his defense, Wilson also called Special Agent Christopher Orcinolo and recalled Officer Joseph Brown to testify about Wilson's behavior and statements during and after his arrests.

[3]After his state arrest, Wilson filed the "bill of sale" with the clerk of the Broward County, Florida court.  Wilson later learned that the purported seller had died, so Wilson filed in the state court another copy of the bill of sale, on which he wrote at the top: "dying declaration." Wilson believed, based on his own legal research, that such an inscription would allow the document to be used as evidence in his case.  The government put both versions of the bill of sale into evidence during Wilson's defense.

After some research, Wilson concluded that he did not need to register or get a license for the replica, and thus he did not do it. Wilson had no knowledge of "the length, width, or any legalities of what was going on." Wilson's only plans were to restore the shotgun, see if it worked, and hang it on a wall in his office. Wilson denied ever saying that he bought the shotgun for protection in his neighborhood.

As to his June 12 arrest, Wilson admitted that he had the shotgun in his car and claimed that he was taking it to the shooting range to see if it worked. Wilson bought ammunition for the shotgun based on a store employee's recommendation for 12-gauge shells, the type of ammunition the replica required. Wilson did not know how powerful the ammunition was and was not a firearms expert. Wilson alleged that he put the shotgun ammunition in his driver's side door and that the shotgun was not loaded. He did not make it to the range because he got arrested.

Wilson believed Officer Palant was a racist officer following and harassing him because Palant had pulled him over and given him tickets in the past. As for this offense, Wilson asserted that Palant: (1) pulled him over for no reason; (2) never explained why he needed to see Wilson's license; and (3) made racist comments to Wilson in the back of the patrol car after his arrest.[4] Wilson denied

---

[4]Wilson did not say what racist comments Officer Palant made to him. Wilson believed Officer Palant was targeting him because, approximately a year earlier, Officer Palant stopped Wilson and issued Wilson three citations for failing to wear his seat belt and for failing to have

breaking any laws or traveling on the streets that Palant claimed. Believing he did not need to provide his license when he did nothing wrong, Wilson responded "then arrest me" to Officer Palant's ultimatum. Wilson "kn[e]w for a fact that [the shotgun] was not loaded," meaning that Officer Palant lied when he said the shotgun was loaded. Wilson also denied threatening Palant. Wilson told the jury that, because of this arrest, he was in jail for six months, away from his family and job for months, and was still in jail. Wilson stressed that he had a wife, kids, and a steady job, he was not a convicted felon or a danger to society, and he was innocent and should be set free.

## II. PROCEDURAL HISTORY

### A. Indictment and Plea

Wilson's indictment charged that, on or about June 12, 2016, Wilson "knowingly possessed a firearm, that is, a weapon made from a shotgun which, as modified, had an overall length of less than twenty-six (26) inches and a barrel of less than eighteen (18) inches in length" that was "not registered to him in the National Firearms Registration and Transfer Record," in violation of 26 U.S.C. §§ 5861(d) and 5871. Wilson pled not guilty.

---

proof of registration and insurance. Those citations were later dismissed. Officer Palant denied targeting Wilson.

**B.    Wilson's Motion to Suppress**

Pre-trial, Wilson filed a counseled motion to suppress the shotgun, ammunition, and any statements or evidence gained from Officer Palant's illegal traffic stop of Wilson and warrantless search of his car.  Wilson contended that the initial traffic stop was illegal because the officers lacked probable cause, or reasonable suspicion, that he committed any of the alleged traffic infractions.  The warrantless search of his car was illegal because the illegality of the traffic stop stripped the officers of lawful authority to impound his car and conduct an inventory search.

At the suppression hearing, Officer Palant and two other officers testified about Wilson's traffic stop, his arrest, and the inventory search of his car.  The government presented several of the same exhibits that it later presented at trial. Officer Palant testified that he conducted a traffic stop because: (1) his in-car radar device clocked Wilson's car, albeit traveling in the opposite direction, at 56 miles per hour on a 40-mile-per-hour road; (2) Wilson's window tint appeared to be darker than the legal limit; and (3) the driver's side door was open while he drove for about 20 seconds.  Palant took a U-turn and followed Wilson.  By the time Palant caught up with Wilson's car, Wilson had turned into the gas station. Despite Palant's explanation that he was conducting a traffic stop and repeated

9

orders for Wilson to show his driver's license, Wilson refused. When Palant gave Wilson the ultimatum, Wilson said "then arrest me," which Palant did.

Officer Palant testified that, because Wilson's car was blocking a gas pump, he followed the Pembroke PD's standard operating procedures ("SOPs"). Those SOPs provided that an arrestee's car should be towed when: (1) the operator himself is arrested, unless the owner is a different person who can legally drive the car; or (2) the car creates a traffic hazard or is illegally parked. The impounding officer must inventory any towed vehicles and the contents therein, "without exception." During the inventory, Office Palant discovered the sawed-off shotgun, loaded with ammunition. The shotgun had no stalk, had duct tape on the handle, was jagged at the end of the barrel, and had ammunition typically used for self-defense. Another officer testified that Wilson later revealed that he received the shotgun from his friend, planned to refurbish it, and needed it for protection in his neighborhood.

During the suppression hearing, Wilson testified about his defense theory and Officer Palant's harassment of and racial animus towards him. Wilson also recalled Palant to try to establish, among other things, that he arrested Wilson for a non-arrestable offense. Palant testified that Wilson was arrested for failing to obey Palant's command to present a driver's license, which was an arrestable offense under Fla. Stat. § 316.072(3). Wilson attempted to elicit Palant's testimony that,

10

while § 316.072(3) was an arrestable offense, § 316.072(1)—under which he actually was arrested—was not.  Palant conceded that the arrest report itself listed the charged offense as under Fla. Stat. § 316.072(3), but that he had crossed out the "(3)" with a pen and replaced it with "(1)."  Palant explained that the jail did not accept sub-section "(3)" in its booking system as a valid charge and asked him to change it to sub-section "(1)."

The district court took the suppression motion under advisement.  In a later order denying the motion, the district court credited Officer Palant's testimony in full and found that: (1) Palant had probable cause to stop Wilson for his traffic violations and arrest him for his outright refusal to produce his driver's license despite multiple requests; and (2) Palant legally seized the shotgun pursuant to a valid inventory search under the Pembroke PD's SOPs.

## C.    Trial

At trial, Wilson proceeded pro se and without appointed standby counsel. Throughout trial, Wilson wore his black and white corrections jumpsuit with the words "Maximum Custody" on the back.  During jury selection, Wilson wore leg shackles and hand shackles fastened to a waist chain.  After jury selection and for the remainder of the trial, the hand shackles were removed, but the leg shackles were kept.

11

In his opening statement, Wilson pointed out to the jury, "I know you guys see me here dressed in this jumper." Wilson made his time in jail and his unjust incarceration—including his innocence, his length of incarceration since the arrest, his separation from his family and job, and his desire to be free—a central aspect of his defense during opening and closing statements and throughout his own narrative testimony. Wilson repeatedly emphasized he was innocent, he was in jail being held without bond, he had been in jail for six months and was still in jail, he was taken from his job and family, and he wanted to just go home to his wife and children. He asked the jury to find him innocent and set him free from jail. Given his trial strategy, Wilson never objected to appearing before the jury in prison clothing and shackles.

During its case-in-chief, the government presented: (1) the testimonies of law enforcement officers, including Officer Palant and an ATF expert; (2) video surveillance footage of the gas station where Wilson was arrested; (3) photos of the scene, Wilson's car, and the shotgun; (4) Wilson's June 12, 2016, traffic citations; and (5) certificates of accuracy for Officer Palant's speedometer, radar gun, and window tint meter. When the government rested, Wilson moved for a judgment of acquittal, which the district court denied.

Wilson's defense was that: (1) Officer Palant's stated reasons for the initial traffic stop were pretext; (2) Palant was a racist who was hostile towards Wilson;

12

(3) Wilson purchased his shotgun as an antique or a replica of an antique shotgun to refurbish and hang on his wall; (4) Wilson lacked knowledge of the alleged unlawfulness of his possession of the shotgun or the need to register it; and (5) Wilson was innocent, was unjustly in jail, and needed to be set free.

In rebuttal, the government called more witnesses, including Officer Kincanon who testified about the June 12 arrest. Wilson renewed his motion for a judgment of acquittal, which the district court denied. Ultimately, the jury convicted Wilson.

## D.     Post-Trial Motions

After trial, Wilson filed counseled motions to vacate his conviction, grant him a new trial, and hold a competency hearing. Wilson contended that: (1) newly discovered evidence showed that he was suffering from severe mental illness before, during, and after trial; (2) his rights to counsel and due process were violated when he was forced to proceed pro se at trial without standby counsel; (3) his rights to due process and a fair trial were violated because the district court permitted him to appear before the jury in prison clothes and shackles; and (4) the district court erred in denying his motion to suppress and later motion for a judgment of acquittal.

The district court denied Wilson's motions, concluding that: (1) Wilson likely knew of and could have accessed before trial his medical records of his

13

alleged severe mental illness; (2) Wilson made no contemporaneous objection to his appearance at trial; (3) the district court never ordered or compelled him to wear his prison clothes and shackles; (4) Wilson highlighted no cases suggesting that a court must sua sponte prevent such an appearance; (5) Wilson used his appearance and incarceration to his advantage during his defense; and (6) his remaining motions were untimely and/or meritless.

Wilson also filed numerous post-trial pro se motions, including several challenging the district court's subject matter jurisdiction.  The district court denied or struck each of these pro se motions.[5]

### III. SENTENCING

Wilson's Presentence Investigation Report ("PSI") set his base offense level at 20, pursuant to U.S.S.G. § 2K2.1(a)(4)(B), because, as an unlawful drug user, he was a "prohibited person" at the time of the firearm offense.  Namely, Wilson conceded that he started smoking marijuana at age 18 and that he regularly smoked two blunts of marijuana per day, continued his daily use while on bond in his state case, and only stopped his daily use one month before his federal arrest in August 2016.  The PSI increased Wilson's base offense level by: (1) two levels since his

---

[5]Throughout the proceedings, Wilson had difficulties with appointed counsel, requested substitute counsel, filed numerous pro se motions, and at times proceeded pro se.  We outline the district court's rulings as to his counsel and his pro se status later in this opinion.  See infra Section VII.

offense involved a sawed-off shotgun, a "destructive device"; and (2) two levels since he willfully obstructed justice by committing perjury and providing materially false information. Wilson's total offense level of 24 and criminal history category of I yielded an advisory guidelines range of 51 to 63 months' imprisonment.

Wilson filed several counseled PSI objections challenging, of relevance: (1) his base offense level of 20 because he was not a "prohibited person" at the time of the offense; (2) the obstruction-of-justice increase because any perjury or false information unintentionally resulted from his confusion and mental illness; (3) the destructive-device increase; and (4) his resulting total offense level and advisory guidelines range. He also requested a downward departure or variance for his diminished capacity and/or mental illness.

At the sentencing hearing, Wilson proceeded pro se, and the district court addressed his PSI objections. As to his base offense level, Wilson argued that he was not a "prohibited person" because his possession of the sawed-off shotgun was not linked to any illegal activity aside from his failure to register it. The government responded that Wilson was a "prohibited person" because, under 18 U.S.C. § 922(g)(3), he was "an unlawful user of or addicted to any controlled substance," as he admitted to daily use of marijuana up through the time of the

offense. Wilson pointed out that he had no drug convictions and argued that the government needed evidence beyond just his statement of drug use in the PSI.

The district court overruled Wilson's objection to his base offense level of 20, finding that Wilson was a "prohibited person" because he was using marijuana at the time of the firearm offense. The district court overruled Wilson's remaining PSI objections and adopted the PSI's total offense level of 24 and advisory guidelines range of 51 to 63 months' imprisonment. Wilson reiterated his request for a downward departure or variance based on his diminished capacity, highlighted that he was trying to take responsibility for the mistakes in his life, apologized for taking the court's time and for his misunderstanding of the law regarding firearm registry, and asked for the court's mercy. The government requested a 10-year sentence, given the seriousness of the offense and Wilson's dishonesty, substance abuse, disrespect for the law and police, and defiant and hostile behavior.

The district court sentenced Wilson to 63 months' imprisonment, followed by 3 years' supervised release. Wilson objected and timely appealed.

Originally, Wilson filed pro se initial and supplemental briefs. We then appointed counsel for Wilson, and counsel filed initial and reply briefs. Wilson's counseled briefs are the operative briefs for purposes of this appeal. We note, however, that counsel has advanced Wilson's arguments raised in his pro se briefs

16

that the district court lacked subject matter jurisdiction and erred in denying his motion to suppress.

## IV.  SUBJECT MATTER JURISDICTION AND CONSTITUTIONAL CHALLENGES

On appeal, Wilson argues that the district court erroneously denied his motions to dismiss for lack of subject matter jurisdiction.[6]  Wilson challenges jurisdiction on two fronts.  First, citing the Admiralty Clause of Article III and the Define and Punish Clause of Article I of the U.S. Constitution, U.S. Const. art. I, § 8, cl. 10; id. art. III, § 2, cl. 3, Wilson argues that the district court lacked jurisdiction because he was arrested on dry land, and the federal offense of possessing an unregistered firearm is "punishable only when performed on the high seas or any other navigable waterway within the admiralty/maritime jurisdiction of the United States."  This first proposition is meritless.

Federal district courts "have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States."  18 U.S.C. § 3231.  "[S]o long as the indictment charges the defendant with violating a valid federal statute as enacted in the United States Code, it alleges 'an offense against the laws of the United States,' and, thereby, invokes the district court's subject-matter

---

[6]This Court reviews de novo questions regarding a district court's subject matter jurisdiction, United States v. Grimon, 923 F.3d 1302, 1305 (11th Cir.), cert. denied, 140 S. Ct. 536 (2019), and the constitutionality of a statute, United States v. Cabezas-Montano, 949 F.3d 567, 586 n.10 (11th Cir.), cert. denied, __ S. Ct. __, 2020 WL 3492674 (2020).

jurisdiction." United States v. Grimon, 923 F.3d 1302, 1305 (11th Cir.) (quotation marks omitted), cert. denied, 140 S. Ct. 536 (2019).

Wilson was indicted for a federal offense, in violation of 26 U.S.C. §§ 5861(d) and 5871.  Under § 5861(d), it is "unlawful for any person . . . to . . . possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record."  26 U.S.C. § 5861(d); see also id. § 5871 (providing the penalties for this federal offense).  Because Wilson's indictment alleged conduct falling under § 5861's proscription—knowingly possessing an unregistered firearm in Florida—the district court had subject matter jurisdiction under § 3231 over his case.  See Grimon, 923 F.3d at 1305-07.

Wilson's admiralty jurisdiction argument is frivolous.  The Define and Punish Clause grants Congress the power to "define and punish Piracies and Felonies committed on the high seas, and Offen[s]es against the Law of Nations."  U.S. Const. art. I, § 8, cl. 10.  This Congressional authority to enact law under one constitutional provision is separate from—and neither eliminates nor diminishes in any way—federal district courts' exclusive original jurisdiction under a different provision, § 3231, to adjudicate prosecutions of all federal offenses.  United States v. Bane, 948 F.3d 1290, 1295 (11th Cir. 2020).  Further, § 5861(d) makes no mention of maritime or admiralty jurisdiction, the high seas, or navigable

18

waterways, and a § 5861(d) offense is "punishable" when committed on dry land. Cf. U.S. Const. art. III, § 2, cl. 3.

Second, Wilson contends that the district court lacked subject matter jurisdiction because the National Firearms Act is facially unconstitutional, as it violates the Tenth and Second Amendments' protection of citizens' and states' rights and Florida's privilege to control its citizens' possession of weapons. This contention is also frivolous. As noted above, the district court has subject matter jurisdiction over a criminal case so long as the indictment itself alleges a violation of a federal statute, regardless of any constitutional challenge to the criminal statute. Grimon, 923 F.3d at 1305. In addition, the Supreme Court squarely rejected Wilson's constitutional argument over 80 years ago: "[T]he [Tenth Amendment] objection that the [National Firearms Act] usurps police power reserved to the States is plainly untenable" and "we cannot say that the Second Amendment guarantees the right to keep and bear" an unregistered sawed-off "shotgun having a barrel of less than eighteen inches in length." United States v. Miller, 307 U.S. 174, 175-78, 59 S. Ct. 816, 816-18 (1939). And we have held that the Act is constitutional as an exercise of the Taxing Power. United States v. Bolatete, 2020 WL 5784153, at *5-8 (11th Cir. Sept. 29, 2020); United States v.

19

Spoerke, 568 F.3d 1236, 1245-46 (11th Cir. 2009).  Wilson's subject-matter-

jurisdiction challenge wholly fails.[7]

## V.  SUFFICIENCY OF THE EVIDENCE

Next, Wilson contends that the government failed to prove his knowledge as

to each element of the charged firearm offense, as required under Rehaif v. United

States, 588 U.S. __, 139 S. Ct. 2191 (2019).[8]

To convict a defendant under 26 U.S.C. § 5861(d), the government must

prove beyond a reasonable doubt that: (1) the defendant possessed a "firearm"

within the meaning of 26 U.S.C. § 5845(a) of the National Firearms Act; (2) the

defendant knew the features of the firearm that brought it within the scope of the

Act; and (3) the firearm was not registered to the defendant.  See United States v.

Ruiz, 253 F.3d 634, 637-39 (11th Cir. 2001).  For purposes of § 5861(d), § 5845(a)

defines "[f]irearm" to include a sawed-off shotgun—that being, "a weapon made

from a shotgun if such weapon as modified has an overall length of less than 26

inches or a barrel or barrels of less than 18 inches in length."  26 U.S.C. § 5845(a).

---

[7]For the first time in his counseled reply brief on appeal, Wilson contends that the Congress also lacked authority to regulate his wholly intrastate possession of his shotgun under the Commerce Clause.  We decline to consider this argument, as Wilson failed to raise it below or in his initial counseled or pro se briefs on appeal.

[8]Our Court reviews de novo the district court's interpretation of a statute.  Cabezas-Montano, 949 F.3d at 586 n.10.  We also review de novo whether sufficient evidence supported the jury's verdict.  Id. at 595 n.27.  In making this determination, we view the evidence in the light most favorable to the government and resolve all reasonable inferences and credibility evaluations in favor of the verdict.  Id.  We will overturn the jury's verdict only if "no trier of fact could have found guilt beyond a reasonable doubt."  Id. (quotation marks omitted).

This statutory definition in § 5845(a) carves out an exception for an "antique firearm or any device . . . which, although designed as a weapon, the Secretary finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon." Id. In turn, § 5845(g) defines an "antique firearm" as:

> any firearm not designed or redesigned for using rim fire or conventional center fire ignition with fixed ammunition and manufactured in or before 1898 (including any matchlock, flintlock, percussion cap, or similar type of ignition system or replica thereof, whether actually manufactured before or after the year 1898) and also any firearm using fixed ammunition manufactured in or before 1898, for which ammunition is no longer manufactured in the United States and is not readily available in the ordinary channels of commercial trade

Id. § 5845(g).

While in the district court, Wilson contested all three elements of his § 5861(d) offense, but on appeal he no longer challenges the first and third elements. Wilson does not dispute that: (1) he possessed the shotgun; (2) the shotgun as modified meets the statutory definition of a "firearm" in § 5845(a); and (3) the shotgun was unregistered. Instead, he argues that the government failed to produce sufficient evidence that he "knew" each element was satisfied. Wilson contends the government must prove: (1) he "knew" the shotgun's barrel was less than 18 inches in length; (2) he "knew" the shotgun was not an antique and did not use antique ammunition or an antique ignition system; and (3) he "knew" the shotgun had to be registered.

21

Wilson's claims fail.  The Supreme Court and this Court consistently have held that, although the requisite mens rea to prove a violation of § 5861(d) is "knowledge," that mens rea does not attach to each element of that offense.  See Staples v. United States, 511 U.S. 600, 619, 114 S. Ct. 1793, 1804 (1994); United States v. Miller, 255 F.3d 1282, 1286-87 (11th Cir. 2001); Ruiz, 253 F.3d at 638; United States v. Moore, 253 F.3d 607, 609-10 (11th Cir. 2001).  While the government must prove the fact that the weapon was unregistered, it need not prove that the defendant knew the weapon was unregistered.  Ruiz, 253 F.3d at 638.  The government also need not prove that the defendant knew his possession of the weapon was unlawful or that he knew "what features define a 'firearm' under 26 U.S.C. § 5845(a)."  Id. at 638 n.4; Miller, 255 F.3d at 1286 n.3; see also Rehaif, 588 U.S. at __, 139 S. Ct. at 2198 (providing that, generally, "ignorance of the law (or a mistake of law) is no excuse . . . where a defendant has the requisite mental state in respect to the elements of the crime but claims to be unaware of the existence of a statute proscribing his conduct" (quotation marks omitted)).

Rather, the knowledge requirement for a § 5861(d) offense comes into play only as to the second element—the government must prove that the defendant was "aware that his weapon possess[ed] any of the features detailed in 26 U.S.C. § 5845(a)."  Ruiz, 253 F.3d at 638 (emphasis added).  Importantly, the defendant needs to be aware of only one of the weapon's features that brings it under

22

§ 5845(a)'s definition of "firearm," not each feature or a particular feature.  See id.
At bottom, the government was required to prove that Wilson knew that his shotgun, as modified, either (1) was less than 26 inches in overall length, or (2) had a barrel of less than 18 inches in length.  See id.; 26 U.S.C. § 5845(a).

As to the second element, the government produced sufficient evidence that Wilson knew, or was aware, that his shotgun either was less than 26 inches in overall length or had a barrel of less than 18 inches in length.  "[K]nowledge can be inferred from circumstantial evidence, including any external indications signaling the nature of the weapon."  Staples; 511 U.S. at 615 n.11, 114 S. Ct. at 1802 n.11; Moore, 253 F.3d at 611 (quotation marks omitted).

At trial, the government introduced into evidence Wilson's sawed-off shotgun itself.  A forensics expert testified that, using a standardized firearm ruler, the shotgun measured 25 inches in overall length (less than 26 inches) and had a barrel of 14.25 inches in length (less than 18 inches).  The length of the barrel alone was "a patently obvious characteristic, readily apparent to anyone, including [Wilson], who observes the gun."  See Miller, 255 F.3d at 1287 (holding there was sufficient circumstantial evidence of defendant's mens rea under § 5681(d) where the shotgun was admitted and an ATF agent testified that shotgun's barrel was 15.5 inches long).

What's more, Wilson explicitly testified that he had no knowledge of "the length, width, or any legalities of what was going on."  The jury rejected this testimony, as it was entitled to do, and apparently believed the opposite—that Wilson was aware that his shotgun's overall length was less than 26 inches or at least that its barrel's length was less than 18 inches.  See United States v. Singer, 963 F.3d 1144, 1159 (11th Cir. 2020) ("[W]hen a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true" (quotation marks omitted)); United States v. Shabazz, 887 F.3d 1204, 1220 (11th Cir. 2018) (providing that the jury may "consider that [opposite] inference as substantive evidence of [the defendant's] guilt" (quotation marks omitted)); United States v. Brown, 53 F.3d 312, 314-15 (11th Cir. 1995) ("At least where some corroborative evidence of guilt exists for the charged offense . . . and the defendant takes the stand in his own defense, the defendant's testimony, denying guilt, may establish, by itself, elements of the offense."); United States v. Pon, 963 F.3d 1207, 1234 (11th Cir. 2020) ("This is especially true in regard to highly subjective elements such as the defendant's intent or knowledge." (quotation marks omitted)).

As part of his denial about the length of his shotgun and its barrel, Wilson testified that he thought the shotgun was an "antique firearm" or "replica of an antique firearm."  However, an ATF expert testified the shotgun was not an

24

"antique firearm" or a "replica of an antique firearm" because: (1) it was manufactured after 1961; (2) it was not a replica of any matchlock, flintlock, percussion cap, or similar type of ignition system; (3) it used modern, fixed ammunition readily available in the ordinary channels of U.S. commercial trade; and (4) the ammunition was not loaded from the end of the barrel and by driving down a ball. These important and perceptible differences between Wilson's shotgun and an antique firearm—if not individually, certainly cumulatively— indicated to an owner, like Wilson, that this shotgun was not an antique firearm and thus to a reasonable juror that Wilson was not credible in his testimony.

Other pieces of evidence amply support the jury's rejection of Wilson's testimony as not credible as to his awareness of the length of his shotgun and its barrel. Indeed, Wilson's testimony is riddled with inconsistencies. First, Wilson testified that he bought the shotgun at a flea market on the side of the road from an unknown man and that buyers never get receipts at the flea market. Yet, Wilson claimed he got a receipt or bill of sale for his shotgun so he would not be "up the creek without a paddle." Second, although the bill of sale was dated June 2, 2016, before Wilson's arrest on June 12, 2016, it listed the buyer as his FBE company that he did not incorporate until July 21, 2016, a month after his arrest. Third, although he did not know the shotgun seller's name, Wilson testified that the seller was now deceased and that Wilson had resubmitted the bill of sale with the "dying

25

declaration" inscription so it could still be used in court to support his defense. Fourth, Wilson told officers that he planned to use the shotgun for protection in his neighborhood, only to later deny that claim and instead testify that he intended only to restore it and hang it on his wall. Still yet, Wilson testified that he was taking the shotgun to the range to make sure it worked. Wilson also bought modern, powerful rounds that he intended to shoot at the range.

In sum, there was more than sufficient evidence from which a jury could reasonably infer that Wilson knew his shotgun was a weapon, not a collector's item, and that he further knew the shotgun, as modified, was less than 26 inches in overall length or at least that its barrel was less than 18 inches in length. See 26 U.S.C. § 5845(a).

Rehaif does not change our binding precedent on the requisite mens rea for a violation of § 5861(d) for several reasons. First, Rehaif addressed a differently worded and structured firearm statute. In Rehaif, the Supreme Court held that, in prosecutions of possession of a firearm or ammunition by certain individuals under 18 U.S.C. §§ 922(g) and 924(a)(2), the government must prove—as an element of the crime—that, when the defendant possessed the firearm, "he knew he belonged to the relevant category of persons barred from possessing a firearm," such as his status as a convicted felon. See 588 U.S. at __, 139 S. Ct. at 2194-97, 2200. The statutory text in § 924(a)(2) penalizes those who "knowingly" violate § 922(g)'s

26

prohibition on felons possessing firearms.  See 18 U.S.C. § 924(a)(2).  The Supreme Court expressly limited its holding in Rehaif to only the particular § 922(g) provision at issue in Rehaif.  See Rehaif, 588 U.S. at __, 139 S. Ct. at 2200 ("We express no view, however, about what precisely the [g]overnment must prove to establish a defendant's knowledge of status in respect to other § 922(g) provisions not at issue here.").  Rehaif made no ruling on the requisite elements for violations of other statutory schemes, let alone § 5861(d) in particular.  See id. at __, 139 S. Ct. at 2200.

Second, Rehaif is fully consistent with, and in fact applied the reasoning of, Staples, the Supreme Court precedent that controls the result in Wilson's case. Unlike §§ 922(g) and 924(a)(2) addressed in Rehaif, the National Firearms Act, § 5861(d), at issue in Staples, does not contain the word "knowingly" or any other explicit mens rea element.  See 26 U.S.C. §§ 5861(d), 5871.  Prior to Staples, the Supreme Court had held in United States v. Freed, 401 U.S. 601, 91 S. Ct. 1112 (1971), that § 5861(d) does not require proof that the defendant knew the "firearm" was unregistered.  Despite the statute's silence as to mens rea and the prior precedent in Freed, the Staples Court concluded that for purposes of § 5861(d), the government must prove that the defendant knew the characteristics of the weapon that made it a "firearm" as defined in § 5845(a).  In so holding, the Supreme Court drew upon the common law presumption in favor of scienter in criminal statutes

27

and rejected the government's argument that Congress intended "to dispense with a conventional mens rea element," a construction that "potentially would impose criminal sanctions on a class of person whose mental state—ignorance of the characteristics of the weapons in their possession—make their actions entirely innocent." Id. at 605-06, 614-15, 114 S. Ct. at 1797, 1802.

In reaching its holding as to § 922(g)'s mens rea requirement, the Rehaif Court repeatedly cited Staples favorably, including Staples's discussion of the presumption in favor of scienter and the role scienter plays in separating wrongful from innocent acts. Rehaif gave no indication that it was overruling or abrogating Staples or any of its progeny. See id. at __, 139 S. Ct. at 2195-98. Accordingly, Staples, and our Circuit precedent applying Staples—Miller, Ruiz, and Moore— foreclose Wilson's argument regarding § 5861(d)'s knowledge element.

Wilson's remaining arguments fare no better. Although we need not consider these arguments because they were inadequately briefed, we briefly explain why they also fail on the merits. Wilson first argues that the National Firearms Act is unconstitutionally vague because his offense turns on a fact he considers "visually imperceptible." Setting aside the fact that the length of a firearm is hardly "imperceptible," the void-for-vagueness doctrine asks whether "it is unclear what fact must be proved," not whether a particular fact might be difficult to prove. FCC v. Fox TV Stations, Inc., 567 U.S. 239, 253, 132 S. Ct.

28

2307, 2317 (2012).  Wilson also argues that the district court should have treated his case as a criminal tax case, mistakenly believing that tax offenses always have a heightened mens rea.  But a crime's mens rea flows out of its text, and unlike the tax offenses Wilson cites, section 5861(d) does not have a mens rea of willfulness.  He finally argues that the district court should have applied the rule of lenity, which he misunderstands as an option for leniency.  But the rule of lenity is a canon of construction that applies when a provision's meaning is ambiguous, and the statute here is not.  United States v. Phifer, 909 F.3d 372, 383-84 (11th Cir. 2018).

## VI.  JURY INSTRUCTION

Wilson's counseled brief argues that the district court did not properly instruct the jury as to the knowledge element.  With respect to the elements of the offense, the district court instructed the jury as follows:

> The defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt.
>
> First, the defendant possessed a firearm.
>
> Second, the firearm was not registered to the defendant in the national firearms registration and transfer record and
>
> Third, the defendant knew that the firearm was a weapon made from a shotgun which as modified has an overall length of less than 26 inches or a barrel less than 18 inches in length.
>
> The government does not have to prove that the defendant knew the

29

item described in the indictment was a firearm that must be legally registered. The government only has to prove beyond a reasonable doubt that the defendant knew about the specific characteristics or features of the firearm that made it subject to registration, namely, that the firearm was a weapon made from a shotgun which as modified has an overall length of less than 26 inches or that the firearm had a barrel less than 18 inches in length.

Wilson raised no objection to this jury instruction at trial. The district court's instruction is consistent with our precedent that the government is not required to prove that Wilson knew his firearm must be registered and that the government only has to prove the defendant knew the features of the firearm that make it subject to registration. See Staples, 511 U.S. at 619, 114 S. Ct. at 1804; Miller, 255 F.3d at 1286-87; Ruiz, 253 F.3d at 638; Moore, 253 F.3d at 609-10. Wilson's conclusory argument on appeal does not establish error, much less plain error.

## VII. MOTION TO SUPPRESS

Wilson argues that the district court erred in denying his motion to suppress the physical and testimonial evidence derived from the warrantless search of his car following his unlawful traffic stop and arrest for non-arrestable traffic violations.[9] The Fourth Amendment protects "[t]he right of the people to be secure

---

[9]When reviewing a district court's denial of a motion to suppress, we review the court's findings of fact for clear error and its application of law to the facts de novo. United States v. Campbell, 970 F.3d 1342, 1350 (11th Cir. 2020). In doing so, we consider "all the evidence in the light most favorable to the prevailing party—in this case, the [g]overnment." Id. Our review may go beyond the evidence presented at the suppression hearing, and we may consider the entire record. Id. A district court's factual findings will not be overturned unless, upon reviewing the record, we are left with a definite and firm conviction that a mistake has been made. United States v. Caldwell, 963 F.3d 1067, 1075 n.4 (11th Cir. 2020). The party moving

in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

## A.    Initial Traffic Stop & Seizure of Wilson

A traffic stop constitutes a seizure under the Fourth Amendment. United States v. Campbell, 970 F.3d 1342, 1351 (11th Cir. 2020). To comply with the Fourth Amendment, a traffic stop must be supported by an officer's reasonable suspicion, that is "a particularized and objective basis for suspecting the person stopped of criminal activity." Id. (quotation marks omitted). "Criminal activity includes even minor traffic violations." Id.; see United States v. Hawkins, 934 F.3d 1251, 1259 (11th Cir. 2019) ("Law enforcement may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles." (quotation marks omitted) (alteration accepted)).

A full-scale arrest, however, must be supported by probable cause. Miller v. Harget, 458 F.3d 1251, 1259 (11th Cir. 2006). "Probable cause exists when the facts and circumstances within the officers' knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or

to suppress evidence bears the burdens of proof and persuasion. United States v. Touset, 890 F.3d 1227, 1231 (11th Cir. 2018).

is about to commit an offense." Id.  As relevant here, the probable-cause standard is satisfied when a police officer witnesses a driver commit a traffic violation.  See United States v. Harris, 526 F.3d 1334, 1338 (11th Cir. 2008).

According to Officer Palant's testimony—which the district court credited—Wilson was stopped for committing these traffic violations: unlawfully speeding, careless driving, and illegally tinted windows.  Officer Palant relied on: (1) his speed measurement training and his patrol car's tested and certified-accurate speedometer and radar gun, which clocked Wilson at 16 miles over the speed limit; (2) Palant's visual observation of the driver's side door being ajar for about 20 seconds while Wilson drove; and (3) Palant's visual observation and tested and certified-accurate tint meter, which showed that Wilson's windows were darker than the legal limit.  Contrary to Wilson's assertion, Officer Palant's traffic stop was not based on "scientifically impossible observations."  In fact, Officer Palant had "a particularized and objective basis for suspecting" Wilson had committed several traffic violations, no matter how minor.  See Campbell, 970 F.3d at 1351 (quotation marks omitted).

After making that legal traffic stop, Officer Palant validly ordered Wilson to produce his driver's license.  Because Wilson repeatedly refused to produce his driver's license, Officer Palant had a reasonable belief that Wilson was committing the offense of refusing to comply with a lawful order from a law enforcement

32

officer under Fla. Stat. § 316.072(3).  See Fla. Stat. § 316.072(3) (making it unlawful, as a misdemeanor in the second degree punishable by incarceration and/or a fine, for a person to "willfully . . . fail or refuse to comply with any lawful order or direction of any law enforcement officer"); see also Fla. Stats. §§ 775.082(4)(b), 775.083(1)(e).  Given Officer Palant had probable cause to believe Wilson committed a criminal offense in his presence, Officer Palant was lawfully entitled to arrest Wilson no matter how minor the offense.  See Manners v. Cannella, 891 F.3d 959, 969 (11th Cir. 2018).

Notwithstanding, Wilson urges that the motion to suppress should have been granted for three reasons.  First, Wilson asserts that the jury made a "dispositive" finding that the traffic stop and seizure were illegal, which was "binding" on the district court in ruling on the motion to suppress.  He relies on a jury note written during deliberations that asked: "If we find the initial traffic stop is illegal, can we use that in our decision[?]"  This jury note simply poses a question to the district court judge.  It makes no finding, and this note has no relevance to the district court's ruling on the motion to suppress.[10]

---

[10]In response to the jury's note, the district court instructed:
Members of the jury, the legality of the initial stop cannot be considered by you in your deliberations.  The legality of the stop is a matter for the [c]ourt and the [c]ourt alone to consider and not the jury.
To the extent Wilson argues the jury's note shows the district court erred in its legal analysis of the stop, the jury note has no relevance to that either.

33

Second, Wilson claims that Officer Palant's reliance on these traffic violations was merely pretext and that Officer Palant stopped him for nefarious reasons. Officer Palant's subjective reasons for stopping Wilson are irrelevant, so long as Palant had probable cause to support the articulated traffic violations. See Hawkins, 934 F.3d at 1259 ("'Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis'; 'the constitutional reasonableness of traffic stops' does not 'depend on the actual motivations of the individual officers involved.'" (quoting Whren v. United States, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774 (1996)) (alteration accepted)).

Third, Wilson contends that Officer Palant arrested him for the non-arrestable offense of violating § 316.072(1), not § 316.072(3). Officer Palant, however, testified that: (1) his original citation listed the failure-to-obey offense under § 316.072(3); (2) Wilson was arrested for violating § 316.072(3); (3) the jail's booking system would not accept sub-section "(3)"; and (4) thus, Officer Palant then changed it to sub-section "(1)" on the arrest report for booking purposes. The district court did not err in crediting Office Palant's testimony. All in all, Wilson's traffic stop and arrest were both lawful.

**B.    Search of Wilson's Car**

We turn to the legality of the search of Wilson's car. Generally, law enforcement officers must obtain a warrant supported by probable cause to justify

34

the search of a person's property.  United States v. Babcock, 924 F.3d 1180, 1194 (11th Cir. 2019).  But there are exceptions.  United States v. Virden, 488 F.3d 1317, 1321-22 (11th Cir. 2007).  This Court has long recognized, as an exception to the Fourth Amendment's warrant requirement, an inventory search of an arrestee's personal property to itemize its contents pursuant to standard inventory procedures.  United States v. Farley, 607 F.3d 1294, 1333 (11th Cir. 2010).  An officer may lawfully impound an arrestee's vehicle so long as the impound decision is based on standard criteria and based on something other than suspicion of evidence of criminal activity.  Sammons v. Taylor, 967 F.2d 1533, 1543 (11th Cir. 1992); see, e.g., United States v. Roberson, 897 F.2d 1092, 1096 (11th Cir. 1990) (holding the officer's inventory search was permissible where defendant was just arrested after parking his car, there was no one present to take custody of his car, and the officer executed the inventory search pursuant to standard police procedures).  The government carries the burden to show that the requirements of this exception were met.  Sammons, 967 F.2d at 1543.

Here, the district court found that, after arresting Wilson with probable cause, Officer Palant properly searched Wilson's car under the inventory-search exception to the Fourth Amendment's warrant requirement and seized the shotgun. We agree.

35

After Wilson's arrest, Officer Palant's decision to tow and inventory Wilson's car was based on the Pembroke PD's SOPs.  The government introduced Pembroke PD's SOPs, which required officers to have an arrestee's car towed if: (1) the car's operator himself is arrested; or (2) the car creates a traffic hazard or was illegally parked.  Both circumstances existed here.

First, Wilson, the car's operator, was arrested.  No one else was in the car to take custody.  Second, Wilson's car was blocking a gas pump.  The SOPs required, "without exception," that Officer Palant, as the impounding officer, inventory the to-be-towed car and its contents.  (Emphasis in original).  In following the SOPs, Officer Palant lawfully discovered and seized Wilson's sawed-off shotgun.  See Sammons, 967 F.2d at 1543; Roberson, 897 F.2d at 1096.  There is no evidence that Palant's impound decision was based on his suspicion of evidence of criminal activity.  See Sammons, 967 F.2d at 1543.  The district court did not clearly err in its factual findings or err in denying Wilson's motion to suppress.

## VIII.  WILSON'S PRO SE REPRESENTATION

Wilson asserts that the district court reversibly erred in failing either to appoint him competent substitute counsel or to sua sponte continue his trial until

36

standby counsel could be present.  Wilson argues the district court forced him to proceed pro se, without standby counsel's presence, throughout the entire trial.[11]

## A.    Wilson's Conflicts with Court-Appointed Counsel

Upon his initial appearance, Wilson was appointed counsel.  Before his arraignment, Wilson moved for substitute appointed counsel.  A magistrate judge granted his request and appointed substitute counsel Martin Feigenbaum.  Despite being represented, Wilson filed numerous pro se motions.

During the first day of the hearing on his counseled motion to suppress, Wilson requested to represent himself, while retaining Feigenbaum as standby counsel.  The district court recessed without ruling on Wilson's request, and Feigenbaum later filed a motion to withdraw as Wilson's counsel.

In response to Feigenbaum's motion, the magistrate judge conducted a hearing pursuant to Faretta v. California, 422 U.S. 806, 95 S. Ct. 2525 (1975).  The magistrate judge: (1) advised Wilson of his rights to counsel and self-representation; (2) stressed that Wilson did not have a right to standby counsel or hybrid representation; (3) assessed his education, background, and mental health; (4) noted his lack of legal education, experience, and familiarity with court rules

---

[11]Our Court reviews de novo the district court's conclusion that a defendant's waiver of counsel was both knowing and voluntary.  United States v. Garey, 540 F.3d 1253, 1268 (11th Cir. 2008).  "[O]n direct appeal[,] . . . the [g]overnment bears the burden of proving the waiver was valid."  Id.  We review for an abuse of discretion the district court's ruling on a defendant's motion for substitute counsel made after an inquiry into the merits of the motion, as the district court did here.  United States v. Calderon, 127 F.3d 1314, 1343 (11th Cir. 1997).

and procedures; (5) addressed the nature of the charges against Wilson and the potential sentence he faced; (6) repeatedly warned Wilson of the many risks of self-representation; (7) highlighted that he would be proceeding against, and held to the same standard as, a legally educated and experienced prosecutor; and (8) confirmed that Wilson understood, nevertheless wished to represent himself, and made the decision knowingly and voluntarily. The magistrate judge found that Wilson was fully advised of his rights and the potential consequences of his decision and that he knowingly and voluntarily waived his right to counsel.

During the colloquy, both Wilson and Feigenbaum requested that the district court permit Wilson to proceed pro se and appoint Feigenbaum as standby counsel. The district court granted their requests. The magistrate judge explicitly advised, however, that, if Wilson changed his mind during the suppression hearing or the trial, the district court would not re-appoint Feigenbaum or another lawyer to represent Wilson. Wilson confirmed he understood.

On January 4, 2017, the district court reconvened the suppression hearing, wherein Wilson represented himself with Feigenbaum present as standby counsel. Thereafter, the district court's chambers telephonically advised Feigenbaum that the defense's motion to suppress was denied. The district court set the jury trial for February 6, 2017.

38

Feigenbaum filed a written notice of a scheduling conflict and contacted chambers. The district court warned Feigenbaum that Wilson's speedy trial period was running and that Wilson would need to file a motion to continue if he wanted to go to trial with Feigenbaum present as standby counsel. On February 2, 2017, Feigenbaum met with Wilson to explain the situation, but Wilson refused to seek a continuance of the trial and demanded that Feigenbaum be present on the scheduled trial date, which Feigenbaum explained was not possible.

On the morning of trial on February 6, 2017, the district court confirmed that Feigenbaum was unavailable for about a week and asked if Wilson was ready for trial. Wilson said he was not ready because Feigenbaum was not present. The district court asked numerous times if Wilson wanted to seek a continuance so Feigenbaum could be present, but Wilson refused. Wilson asserted that the court was forcing him to proceed with an unfair trial; but Wilson later admitted that he was refusing a continuance so his speedy trial clock would run. The district court explained to Wilson that his speedy trial period already was tolled by his filing of his motion to suppress and would not start running again until the court entered a written ruling on his motion. Despite the district court's repeated explanations that Wilson could either proceed with trial pro se alone or seek a continuance so standby counsel Feigenbaum could be present, Wilson continued to reject either option.

39

Because Wilson did not seek a continuance, the district court proceeded with trial.  Upon concluding jury selection, the district court twice offered Wilson opportunities to move for a continuance, but he again refused.  Wilson represented himself at trial without standby counsel Feigenbaum present.

After Wilson's guilty verdict, Feigenbaum filed another motion to withdraw as standby counsel for post-trial matters and sentencing.  The district court held a hearing, granted the motion, and appointed new post-trial counsel William Clay.  Clay filed various post-trial motions, including those concerning Wilson's mental health and competency, which the district court denied.  Meanwhile, Wilson continued to file countless pro se motions.  After a prospective competency evaluation and a hearing, the district court found Wilson competent to proceed to sentencing.  At the end of the competency hearing, Wilson requested to represent himself at sentencing, and post-trial counsel Clay moved to withdraw.  The district court granted post-trial counsel Clay's motion to withdraw, permitted Wilson to proceed pro se at sentencing, and appointed Clay as standby sentencing counsel.

## B.    Wilson's Challenge to his Self-Representation

The Sixth Amendment's guarantee of counsel does not grant defendants an unqualified right to the counsel of their choice.  United States v. Joyner, 899 F.3d 1199, 1205 (11th Cir. 2018).  An indigent criminal defendant who is appointed counsel may not demand different appointed counsel unless he shows good cause.

40

Id.  A defendant shows "good cause" when there is a "fundamental problem, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict."  Id. (quotation marks omitted).

While a defendant has a right to counsel, he also has an equivalent right to self-representation.  United States v. Garey, 540 F.3d 1253, 1265 (11th Cir. 2008). A defendant's waiver of his right to counsel is valid so long as his choice was knowing, intelligent, and voluntary.  Id. at 1266.  In making this determination, we consider the facts and circumstances of the case and the defendant's background, experience, and conduct to decide if his waiver was "made with an apprehension of the nature of the charges, . . . the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter."  Id. (quotation marks omitted).  In conducting a colloquy, the district court should: (1) inform the defendant of the nature of the charges against him, the possible punishments, basic trial procedure, and the risks of self-representation; and (2) elicit information regarding his background, his understanding of the charges against him, and his knowledge of courtroom rules and procedures.  Id. at 1266-67.

Even still, a defendant can validly waive his right to counsel when he: (1) is cooperative and affirmatively invokes his right to self-representation; or (2) is

41

uncooperative and "rejects the only counsel to which he is constitutionally entitled, understanding his only alternative is self-representation with its many attendant dangers." Id. at 1265. "In any given case, the proper course of action will turn on factors the district court is best positioned to assess." Id. at 1266.

Here, the record shows that, at the suppression hearing before trial, Wilson knowingly and voluntarily waived his right to counsel. The magistrate judge engaged Wilson in a thorough Faretta colloquy, wherein it: (1) advised Wilson of his right to counsel and the consequences of waiving that right; (2) informed him of the nature of the charge against him, his potential sentence, the expectation that he will follow basic trial procedure, and the many risks of self-representation; and (3) elicited information regarding Wilson's background, his understanding of the charge against him, and his knowledge of courtroom rules and procedures. See id. at 1266-67. Wilson confirmed he understood and nevertheless wished to waive his right to counsel, despite the consequences, and represent himself. Wilson also confirmed his understanding that, by representing himself, he would be his own attorney and had no right to standby counsel or hybrid representation.[12] Although the magistrate judge ultimately appointed Feigenbaum as standby counsel, his sole role was to consult with Wilson at Wilson's request, not represent him.

---

[12]Of note, Wilson's counseled brief raises no independent challenge to the district court's denial of Wilson's post-trial motions based on his competency and mental health or to the district court's finding that Wilson was competent to proceed to sentencing.

42

On appeal, Wilson makes a belated, uncounseled argument that his choice of self-representation was effectively involuntary because the Criminal Justice Act Plan's attorneys are so under-resourced that the Plan inherently violates the Sixth Amendment's right to effective counsel. But ineffective assistance is a fact-dependent claim, and Wilson does not allege any non-conclusory facts as to how the Plan leads to ineffective counsel or how his Plan-appointed attorneys were deficient. Even if he disliked his appointed attorneys, "[a]n indigent criminal defendant does not have a right to have a particular lawyer represent him." Garey, 540 F.3d at 1263. So Wilson faced two constitutionally permitted choices: accept his appointed counsel or represent himself. Id. at 1263-64. He voluntarily chose the latter. Cf. Godinez v. Moran, 509 U.S. 389, 401 n.12, 113 S. Ct. 2680, 2687 n.12 (1993) (explaining that voluntariness turns on whether the defendant's decision to waive counsel is uncoerced).

Thereafter, Wilson had advance notice that Feigenbaum would not be available on the scheduled trial date and that Wilson would need to move for a continuance of one week if he wanted to have Feigenbaum present as standby counsel. Despite this reasonable option and despite the district court's willingness to continue the trial, Wilson refused to move for a continuance.

Indeed, on the first day of trial, the district court clearly and patiently explained to Wilson numerous times that he had two options: (1) move to continue

43

trial for one week so Feigenbaum could be present as standby counsel; or

(2) proceed with trial and represent himself without standby counsel.  Yet, Wilson

continued to demand a third option that was not available to him—somehow

require Feigenbaum to be present, or ostensibly appoint substitute standby counsel,

so that trial could begin that same day with standby counsel present.  The

magistrate judge had already warned Wilson that he would not be given substitute

counsel and Wilson identified no good cause to warrant substitution of appointed

counsel, let alone substitution of appointed standby counsel to which he already

was not entitled.  See Joyner, 899 F.3d at 1205.

With a full understanding that failure to move for a continuance would result

in Wilson representing himself at trial without standby counsel, an uncooperative

Wilson rejected his two available options and thereby knowingly chose to proceed

without standby counsel.[13]  See Garey, 540 F.3d at 1265-66 (explaining that an

uncooperative defendant may waive his right to counsel if he "engages in behavior

that creates tension between his right to counsel and his right to self-

representation," with full knowledge of his options and the consequences of his

---

[13]While Wilson additionally argues that his self-representation violated the "advocate-witness" rule—because, at trial, he was forced to appear as both an advocate and a witness—the rule is inapplicable to him as a non-lawyer criminal defendant who decided to represent himself. See Duncan v. Poythress, 777 F.2d 1508, 1515 n.21 (11th Cir. 1985) (explaining that the "advocate-witness" rule is an ethical prohibition against lawyers acting as both advocate and witness and clarifying that the "rule is not applicable to the attorney pro se litigant").

choice).  Given these facts and circumstances, the district court properly proceeded with the trial and did not abuse its discretion in declining to appoint substitute standby counsel or in not <u>sua sponte</u> continuing the trial over Wilson's objection.[14]

## C.    Prejudice

Alternatively, even assuming <u>arguendo</u> that the district court erred in proceeding with the trial without standby counsel present, any error was harmless. <u>See</u> <u>United States v. Calderon</u>, 127 F.3d 1314, 1343 (11th Cir. 1997) (explaining that, if an appellant cannot demonstrate that he was prejudiced by the district court's erroneous ruling regarding counsel, the error was harmless), <u>modified on other grounds by</u> <u>United States v. Toler</u>, 144 F.3d 1423 (11th Cir. 1998).  To demonstrate prejudice, Wilson must show that but for standby counsel's absence, the results of his trial would have been different.  <u>See</u> <u>id.</u>

On appeal, Wilson contends that he was prejudiced by standby counsel's absence for two reasons: (1) the government was not required to produce the complete recording of the video surveillance footage from the gas station—which Wilson alleges would have revealed dispositive, exculpatory evidence that Officer Palant's stated reasons for conducting the traffic stop were pretext and false and

---

[14]Arguably, Wilson invited the alleged error he now raises, which would preclude our review.  <u>See</u> <u>United States v. Brannan</u>, 562 F.3d 1300, 1306-07 (11th Cir. 2009) ("[T]he doctrine of invited error is implicated when a party induces or invites the district court into making an error.  Where a party invites error, the Court is precluded from reviewing that error on appeal." (quotation marks and internal citation omitted)).  In the abundance of caution though, we discuss and rule why Wilson knowingly and voluntarily waived his right to counsel.

45

that the citations were for non-arrestable violations; and (2) throughout trial, Wilson appeared before the jury in prison clothes and shackles, which was inherently prejudicial.

Wilson's first claim of prejudice fails because the traffic stop and arrest were lawful given that, as discussed above, Officer Palant had probable cause to support the three traffic violations, one of Wilson's violations was for an arrestable offense, and Palant's alleged "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." See Hawkins, 934 F.3d at 1259.

Wilson's second claim of prejudice—his appearance at trial—also lacks merit due to the particular factual circumstances of this case. Generally, a defendant's appearance in prison clothes and shackles is inherently prejudicial because it reveals to the jury the defendant is in jail and could affect a juror's ability to presume the defendant is innocent. See Deck v. Missouri, 544 U.S. 622, 630-32, 635, 125 S. Ct. 2007, 2012-15 (2005) (visible shackles); Estelle v. Williams, 425 U.S 501, 503-04, 96 S. Ct. 1691, 1692-93 (1976) (prison clothes); see also United States v. Moore, 954 F.3d 1322, 1329 (11th Cir. 2020) (shackles); Shabazz, 887 F.3d at 1218 (prison clothes). But here, in opening statements and throughout the trial, Wilson himself told the jury he was in jail, how long he had been in jail, and that he was still in jail. Wilson argued, among other things, that due to the length of his incarceration, the jury should find him innocent and let him

46

go free. The record is replete with how Wilson intentionally and strategically tried to use his appearance and the fact of his continued incarceration to his advantage at trial. See Shabazz, 887 F.3d at 1218 ("[A] defendant may not create[ ] his own problem by wearing jail clothes for strategic advantage and then seek reversal because he chose to wear those clothes." (quotation marks omitted)). Indeed, Wilson made no contemporaneous objection to his prison clothes and shackling but rather used them as part of his effort to gain the jury's sympathy by repeatedly stressing the length and alleged pretext of his incarceration. Simply put, prison clothes and shackling are not prejudicial when a defendant himself injects his incarceration into the case.

Further, Wilson had already rejected Mr. Feigenbaum as his court-appointed counsel and refused to continue his trial even one week so that Mr. Feigenbaum could be present as standby counsel. And, even when Mr. Feigenbaum actually represented him as court-appointed counsel, Wilson filed his own pro se motions. Under the particular facts of this case, and given the ample evidence against him, Wilson has not shown that his inability to consult with standby counsel as to either alleged trial error affected the outcome of his trial.[15]

---

[15]To the extent Wilson challenges, as independent issues, his prison clothes and shackling and the government's failure to produce the complete recording of the video surveillance footage from the gas station, those claims fail for the same reasons. That is, under plain error review, even assuming errors that were plain, Wilson has not shown that but for these alleged errors, the outcome of his trial would have been different. See United States v. Margarita Garcia, 906 F.3d 1255, 1267 (11th Cir. 2018) (explaining that "to establish prejudice on plain error, the defendant

## IX.  PROHIBITED-PERSON INCREASE AT SENTENCING

Wilson argues that his sentence was procedurally unreasonable because the district court erred in imposing a base offense level of 20 upon finding him to be a "prohibited person" in possession of a firearm under U.S.S.G. § 2K2.1(a)(4)(B).[16]

Section 2K2.1(a)(4)(B) of the Sentencing Guidelines provides a base offense level of 20 for a defendant: (1) whose offense involved a firearm described in § 5845(a), like Wilson's unregistered sawed-off shotgun; and (2) who was a "prohibited person" at the time he committed the offense.  U.S.S.G. § 2K2.1(a)(4)(B)(i)(II), (ii)(I).  A "prohibited person" includes "any person described in 18 U.S.C. § 922(g)."  Id. § 2K2.1 comment. n.3.  In turn, § 922(g) designates as a prohibited person someone who is "an unlawful user of or addicted to any controlled substance," like marijuana.  18 U.S.C. § 922(g)(3) (cross-referencing 21 U.S.C. § 802); see 21 U.S.C. § 802(16) (listing marijuana as a controlled substance).

---

must show there is a reasonable probability that, but for the error, a different outcome would have occurred").

[16]In reviewing a defendant's sentence, we apply the deferential abuse-of-discretion standard, ensuring first that the district court committed no significant procedural error, such as improperly calculating the sentencing guidelines range.  United States v. Almedina, 686 F.3d 1312, 1314-15 (11th Cir. 2012).  This Court reviews the sentencing court's factual findings for clear error and its interpretation and application of the Sentencing Guidelines to those facts de novo.  United States v. Maddox, 803 F.3d 1215, 1220 (11th Cir. 2015).

48

Wilson asserts that, since the government did not prove that he was an unlawful user of marijuana at the time he purchased the shotgun, his increased base offense level was "fundamentally unfair and a quasi-ex post facto violation to penalize him for a subsequently-attained status." Wilson's argument is both refuted by the record and foreclosed by our precedent.

In applying the prohibited-person base offense level premised on unlawful drug use, we have held that a defendant is an "unlawful user" of a controlled substance so long as his use is "ongoing and contemporaneous with the commission of the offense." United States v. Edmonds, 348 F.3d 950, 953 (11th Cir. 2003) (quotation marks omitted). The government need not show that Wilson "was under the influence of an illegal drug at the exact same time he possessed [the] firearm" or "at the time of his arrest." See id. (quotation marks omitted). The government must simply show that "the defendant was an 'unlawful user' of a controlled substance during the same time period as the firearm possession." Id.

Here, while Wilson objected to the PSI's imposition of the increased base offense level for a prohibited person based on his drug use, he did not object to the PSI's factual findings regarding his regular drug use. Significantly, Wilson admitted to use of marijuana since he was 18, to smoking two blunts per day for years, and to smoking this amount through his state arrest for the instant offense and up until one month before his August 2016 federal arrest. In this way, as per

49

his own admissions, Wilson regularly used marijuana "during the same time period" that he purchased and possessed the sawed-off shotgun in June 2016.  See id.  These factual findings showed Wilson's contemporaneous drug use, not any "subsequently-attained status" or violation.  Because the government relied on unobjected-to factual findings in the PSI of Wilson's contemporaneous marijuana use, it was not required to produce any further evidence in support of the increased base offense level for a prohibited person.  The district court did not clearly err in its factual finding or err in its calculation of a base offense level of 20 under § 2K2.1(a)(4)(B).[17]

## X.  CONCLUSION

For the reasons discussed, we affirm Wilson's conviction and sentence.[18]

**AFFIRMED.**

---

[17]Wilson briefly asserts—without any legal argument—that the increased base offense level for a prohibited person under § 2K2.1(a)(4)(B)(i)(II), (ii)(I), and § 922(g)(3) is unconstitutionally vague and allows for an "unwitting violation."  Again, because Wilson has not adequately addressed this separate argument, we need not consider it on appeal.

[18]In the conclusion section of his counseled appellate brief, Wilson briefly asserts that the cumulative errors in his case have prejudiced his right to a fair trial.  We disagree.  See United States v. House, 684 F.3d 1173, 1210 (11th Cir. 2012) (explaining that, "where there is no error or only a single error, there can be no cumulative error").

50